431 A.2d 1073

Eloina JUARBE and Eloina Juarbe, Administratrix of the Estate of Miguel Angel Juarbe, Appellant,

v.

CITY OF PHILADELPHIA and Duke Davis, Ind. & T/A Duke's Exxon, Exxon Company.

Superior Court of Pennsylvania.

Argued Sept. 9, 1980.

Filed July 2, 1981.

R. Elliott Toll, Philadelphia, for appellant.

Stephen H. Skale, Philadelphia, did not file a brief on behalf of City of Philadelphia, appellee.

Edward F. Chacker, Philadelphia, did not file a brief on behalf of Davis, appellee.

John M. Phelan, Philadelphia, for Exxon Co., appellee.

Before BROSKY, WATKINS and MONTGOMERY, JJ.

MONTGOMERY, Judge:

This appeal arises from the lower court's Order granting a Motion for Summary Judgment filed by the Defendant-Appellee, Exxon Company (hereinafter referred to as "Exxon"). The action arose in the lower court as a result of an incident which allegedly took place on March 29, 1974, when the Plaintiff-Appellant, Eloina Juarbe, slipped and fell on an accumulation of petroleum products present on the sidewalk of an Exxon station operated by one William Davis. Mrs. Juarbe, who was pregnant at the time, claimed that as a result of the fall she prematurely gave birth to a child, who subsequently died as a result of causes associated with his premature birth.

The procedural history of the case shows that the Appellant filed this action individually and as administratrix of the estate of her deceased child. Her Complaint in trespass named Exxon, the City of Philadelphia, and Davis, both individually and trading as Duke's Exxon, as defendants. Each of the defendants filed Answers to the Complaint denying liability to the Appellant. Extensive pre-trial discovery took place, including interrogatories, request for documents and admissions, and the appropriate responses thereto. In addition, depositions were taken and affidavits were submitted by the parties. After the Appellant filed a certificate with the court indicating that the case was ready for

trial, Exxon filed its Motion for Summary Judgment. After considering oral argument and the available evidence, the lower court granted Exxon's Motion.

On this appeal, the Appellant contends that it was error for the lower court to find that there was no basis for possible liability on the part of Exxon in connection with the negligent acts alleged by Appellant in her Complaint. Appellant offers three basic arguments, which were also presented to the lower court. First, she argues that at the time of the incident in issue, Davis was a servant of Exxon, and therefore Exxon was liable for his torts under the theory of respondeat superior. Second, the Appellant contends that Exxon had constructive notice of the defect which allegedly caused the harm which is the subject of the suit, and was itself negligent in not correcting the defect. Finally, the Appellant claims that Exxon should not have been dismissed from the action because it held Davis out as its agent and cloaked him with apparent authority to act on its behalf, thereby making it liable for his negligent acts.

In our review of this appeal from the grant of summary judgment, our judicial role has been clearly defined. It was well-stated by Judge Jacobs in *Bollinger v. Palmerton Area Communities Endeavor, Inc.*, 241 Pa.Super. 341, 350, 361 A.2d 676, 680 (1976):

> "It is well established that we can sustain a summary judgment only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *The record must be examined in the light most favorable to the nonmoving party.* The court must accept as true all well-pleaded facts in the plaintiff's . . . pleadings, giving the plaintiff . . . the benefit of all reasonable inferences to be drawn therefrom. Finally, a summary judgment should be granted only when the case is clear and free from doubt. Moreover, in passing upon a motion for summary judgment, *it is no part of our function to decide issues of fact*

*but solely to determine whether there is an issue of fact to be tried* and all doubts as to the existence of a genuine issue as to a material fact must be resolved against the party moving for summary judgment." (emphasis in original; citations omitted)

See also Pennsylvania Rule of Civil Procedure 1035, 42 Pa.C.S.A., on the subject of summary judgments.

 With those concepts in mind, we must also recognize other legal principles applicable to the Appellant's initial contention which is that Exxon should be held liable for torts committed by William Davis under the theory of respondeat superior, on the premise that Davis was allegedly the servant of Exxon. While the Appellant describes Davis as both an agent and a servant in its argument, it is proper to recognize the legal distinction between those terms. A principal and agent can be in the relationship of a master and servant, or simply in the status of two independent contractors. See *Smalich v. Westfall*, 440 Pa. 409, 269 A.2d 476 (1970); *Turley v. Kotter*, 263 Pa.Super. 523, 398 A.2d 699 (1979). If a particular agent is not a servant, the principal is not considered a master who may be held vicariously liable for the negligent acts of the agent. *Smalich v. Westfall, supra; Turley v. Kotter, supra.* A servant is an agent whose *physical conduct* in the performance of the service is *controlled or is subject to the right of control* by the master; that is, a master controls not only the *results* of the work, but the *manner* in which the work is to be performed. *Smalich v. Westfall, supra; Turley v. Kotter, supra.* If the facts as to the relationship are in dispute, a jury question is presented as to the nature of the relationship between the parties. *Feller v. New Amsterdam Casualty Co.*, 363 Pa. 483, 486, 70 A.2d 299, 300–301 (1950). If the facts are not in dispute, the question of the relationship between the parties is one which is properly determined by the court. *Feller v. New Amsterdam Casualty Co., Id.* It is evident that in order to resolve the question of whether the lower court was correct in granting summary judgment on the issue of the Appellant's contention that Exxon had potential liability

under the theory of respondeat superior, we must review all facts available to the lower court, with all reasonable inferences to be drawn therefrom, in a light most favorable to the Appellant. If the available facts create any dispute as to the exact nature of the relationship between Exxon and Davis, we must hold that summary judgment was improperly granted.

■ Initially, we shall direct our review to the terms of two contracts which existed between Exxon and Mr. Davis. Those contracts included a lease for the service station premises, and a contract which both of the parties described as a sales agreement, which also concerned the relationship between the two parties.

Exxon, as could be expected, notes that there is no provision in either the lease or the sales agreement which expressly gives it the right to control Mr. Davis' operation of the service station. Further, Exxon directs our attention to Paragraph 18 of the lease, which provides:

"(18) *Lessee's Business* : It is understood that Lessee operates an independent business. Nothing in this lease shall be construed as reserving or granting to Exxon the right to exercise any control over Lessee's business or the manner in which same shall be conducted; but the control and direction of such business and operations shall be and remain in Lessee, subject only to Lessee's performance of the obligations of this lease."

Exxon contends that the lease and sales agreement thereby establish that it had no right to control Mr. Davis' conduct at the service station. Rather, it claims that the two written agreements firmly establish that the relationship was that of two independent contractors.

Viewing the two written contracts in a light most favorable to the Appellant, we find we are in some disagreement with the position advanced by Exxon. First, we direct our attention to the lease. We note that Davis, the lessee, was required to keep records to accurately show the number of gallons of gasoline and other motor fuels sold at the premises and to permit the lessor to inspect such records because

the lessee's rent was based upon the number of gallons of gasoline and other motor vehicle fuels sold each month. While reserving a fixed minimum amount, Exxon established the rental as: "An amount equivalent to ONE AND FIFTY SIX HUNDREDTHS CENTS (1.56¢) for each gallon of gasoline and other motor fuels up to and including 20,000 gallons; ONE HALF CENT (0.5¢) for each gallon over 20,000 gallons sold during the month or fraction thereof at said premises . . ." In general covenants in the lease, the lessee agreed to use and operate the premises only as a retail automobile service station. He further agreed to keep the station open for the stated purposes at least from 7:00 a. m. to 7:00 p. m. each day except Sundays. He guaranteed to keep the premises clean and sanitary, and also to keep the driveways, ramps and pump islands open for motor vehicle access. He was not permitted to place any sign on the premises which did not relate to the service station business conducted thereon, without first obtaining Exxon's written consent. Exxon reserved the right to inspect the premises and its equipment to assure that Davis was maintaining the same in an order which Exxon considered necessary as a result of its inspections. While Exxon maintains in this action that it bears no possible liability as the master of Davis, the lease required Davis to purchase various types of liability insurance, specifying the minimum amount of coverage for each such required policy. Other clauses of the lease appear to contain the type of normal landlord-tenant provisions which might be found in any commercial lease.

We must also examine the sales agreement for evidence favorable to the Appellant's position. We first note that the sales agreement provided that during its approximate one year term, Davis agreed to purchase from, receive and pay Exxon for quantities of specific Exxon gasoline motor fuels in particular minimum and maximum amounts. However, while setting forth specific minimums and maximums for each type of motor fuel, Exxon reserved unto itself the right to allocate such supplies to Davis. The agreement provided that Exxon would not be required to make single deliveries

of gasoline or other motor fuels of less than a specific quantity of gallons, and could make such deliveries to the premises on any day of the week and at any time of the day or night. Davis agreed to pay Exxon the then current Exxon established dealer price for such products. Exxon retained the right to control the type of trademarks on items displayed and sold by Davis. The sales agreement also contained a specific provision dealing with customer service and complaints. Therein, it provided that the lessee was to render prompt, efficient, and courteous service at the premises to customers purchasing Exxon products, to promptly handle all justified complaints, including making adjustments when appropriate, and to maintain the premises in a manner designed to foster customer acceptance of and desire for Exxon products. It also required Davis to provide a sufficient number of qualified, neatly dressed, and appropriately uniformed attendants in order to render "first class" service to customers. Further, Davis agreed to keep the facility's restrooms clean and adequately furnished with restroom supplies. The agreement contained detailed clauses providing for rights in Exxon for termination of the agreement upon the commission of a breach of its terms by Davis, or upon the happening of several other events including Davis' insolvency, conviction of a felony or a misdemeanor involving fraud, moral turpitude or commercial dishonesty, or upon other ground, whether related or not to Davis' operation of the service station.

In addition to the two contracts discussed above, the record contains other evidence tending to support the Appellant's claim that the lower court erred in granting the Appellee's Motion for Summary Judgment. We find particularly significant the affidavit of one Thomas Anderson. At the time of his affidavit, Mr. Anderson served as Executive Director of an association of service station operators in the states of Pennsylvania and Delaware. His affidavit recited that he had held that position for several years, and had operated and managed retail service stations for approximately seventeen years before he assumed his position as

Executive Director. In the course of his duties with the service station association, he represented dealers in negotiations, grievances, and complaint matters with several major oil companies, including Exxon. His affidavit states that as a result of his experience and position, he was familiar with the practices of Exxon in the Philadelphia area at the time of the Plaintiff's alleged injuries at the Davis service station. Anderson based his testimony upon his review of several documents, including the lease and sales agreement, and also upon his familiarity with Exxon's interpretation of such documents, its enforcement of the documents, and Exxon's general relationship with its dealers. He expressed his strong general feeling that Exxon employed its superior and substantial economic position in the relationship to exert substantial control over the manner in which dealers, such as Mr. Davis, operate their businesses. More specifically, he cited the following as some examples of such control:

1. Although it was in the dealer's interest to receive a high price per gallon for fuel, Exxon would "suggest" the lowest possible retail price, thereby increasing the number of gallons sold by the dealer and also its rental income which was based upon the number of gallons sold. If the dealer would not sell gasoline at the "suggested" price, Anderson stated that Exxon would exert varied sanctions, including a refusal to renew the lease to that dealer.

2. Exxon also held out the threat of a refusal to renew a dealer's lease if the dealer sold any accessories other than those sold or manufactured by Exxon or its subsidiary companies.

3. Exxon refused to honor its credit cards when they were used to purchase products not manufactured by Exxon or its subsidiaries.

4. Exxon's regulation of the quantities and qualities of fuels, in the sales agreement, were set in a way which rendered it virtually impossible for the dealer to sell any fuels other than those provided by Exxon.

5. While the sales agreement seemed to allow a dealer to display and sell products of other oil companies, Ander-

son stated that in practice, Exxon would threaten to discontinue a dealership at the end of a lease if the dealer sold non-Exxon products.

6. Exxon followed the practice of having the stations inspected by an unidentified representative. If the inspector would discover that the premises were unsatisfactory or defective, he would bring this to the attention of the dealer promptly and require him to correct the problem. If the dealer continued to maintain an unsanitary place of business, Exxon would also refuse to renew the lease.

7. Exxon always required the dealer and his employees to wear uniforms showing the Exxon emblem and to display an Exxon sign.

All of this testimony by Anderson appears to strongly support the Appellant's contention that a jury issue was presented on the issue of Exxon's control of Davis as to not only results, but also as to the manner in which he had to achieve those results. Considering such evidence along with the documentary evidence contained in the lease and sales agreement, we are convinced that the issue of whether a master and servant relationship existed should not have been decided summarily by the trial court. Numerous factors in the evidence compel that conclusion. Most significant, of course, is the evidence that Exxon maintained tight control over the operations of its dealers by threatening not to renew their leases and sales agreements if they failed to tow the line in all respects. Thus, it cannot be said that a clear co-equal independent contractor relationship exists where there is evidence that one party can: randomly inspect the other's operation; compel him to keep it neat and orderly; control his hours of operation; control the type and appearance of clothing worn by him and his employees; require him to adjust customer grievances; set the prices he must charge; specify the quantity and quality of products he must dispense but yet have sole discretion on delivery and allocation of such products; prohibit him from posting unauthorized signs; and compel him not to sell products of a

competitor. When such powers are maintained under the threat of a termination of the operator's lease and business at the end of a brief term, Exxon's exercise of substantial control is evident. Further, it should be stated that while other evidence was presented which arguably further supports the Appellant's position on this issue, the matters detailed above were alone sufficient to convince us that error was committed in the granting of summary judgment in this case on the issue of Exxon's potential liability under the theory of respondeat superior.

The lower court, in analyzing the master-servant issue, relied heavily upon the decision of the Supreme Court in the case of *Green v. Independent Oil Co.*, 414 Pa. 477, 201 A.2d 207 (1964). That case involved a situation where an individual died as a result of injuries sustained in a fire at a service station. The representative of his estate brought a damage action against the service station operator as well as the lessor, a petroleum products company which also had a dealership agreement with the station operator. In *Green*, the Supreme Court held that no vicarious liability existed on the part of the petroleum products company, finding that under the facts presented, the operator and the lessor were both independent contractors. The holding in the *Green* case is clearly not controlling of the master-servant issue presented in the instant case because the available evidence in each case may not be equated. In *Green*, the Supreme Court specifically stated that the *sole* evidence of the relationship between the petroleum company and the operator was the written dealer's agreement between the two. No other evidence, particularly including the testimony of witnesses, was before the Court on the critical issue of control. If that was the situation here, we would probably feel that the *Green* decision was controlling. Of course, that is not the case. We do note that the Court in *Green* took particular care to recognize its earlier discussion, in *Feller v. New Amsterdam Casualty Co., supra,* on the power of the principal to terminate its relationship with the agent:

" . . . the power 'to terminate the relationship at any time with or without cause' is not under *Feller,* supra, the *sole* consideration, albeit 'an extremely important considera- tion' in determining whether the person employed is an independent contractor or an employee" (emphasis in orig- inal) 414 Pa. at 485, 201 A.2d at 211.

In the instant case, while Exxon did not retain a right to terminate the relationship at *any* time "with or without cause", there is evidence that it frequently threatened not to renew the leases and sales agreements of its operators if they failed to adhere not only to the requirements of those documents, but also to Exxon's "suggested" business con- duct. This evidence strongly supports the reversal of the lower court's grant of summary judgment on the master- servant issue.

We next examine the Appellant's contention that the lower court also erred in finding no liability, as a matter of law, on the theory that Exxon might be held liable under the doctrines of apparent authority or agency by estoppel. It is true that a principal may be liable to another for the acts of an agent on the grounds of apparent authority or agency by estoppel. In *Turnway Corporation v. Soffer,* 461 Pa. 447, 457, 336 A.2d 871, 876 (1975), the Court explained these agency theories:

"Agency by estoppel is defined by Section 8B. of the Restatement (Second) of Agency and the doctrine has been embraced by this Court in *Reifsnyder v. Dougherty,* 301 Pa. 328, 152 A. 98 (1930). Reifsnyder emphasized two basic elements of agency by estoppel: (1) there must be negligence on the part of the principal in failing to correct the belief of the third party concerning the agent; and (2) there must be justifiable reliance by the third party. . . . Agency by estoppel is generally deemed to be closely related to apparent authority. 2A C.J.S. Agency § 157 (1972). Thus, alternatively stated, a principal who clothes his agent with apparent authority is estopped to deny such authority. *Robertson Coal & Coke Co. v. Rothey,* 106 Pa.Super. 463, 162 A. 332 (1932); *Fay v. Deady,* 82 Pa.Su- per. 187 (1923)."

■ In the instant case, it is clear that the doctrines of apparent authority and agency by estoppel have no application. Quite simply, the critical element of reliance by any third party is completely absent in the facts presented. The Plaintiff-Appellant has presented no evidence even remotely suggesting she *relied* on the fact that Davis represented Exxon, as its agent, when she allegedly fell on the sidewalk by his station. The two doctrines are customarily relevant in the context of business transactions, and have no application under the facts present here. The lower court properly refused to allow the Appellant to proceed to trial on this theory of recovery against Exxon, and summary judgment, in that respect, was properly granted.

Finally, we examine the Appellant's argument that summary judgment should not have been granted to Exxon with regard to the claim that Exxon had constructive notice of the slippery condition of the walk where the Plaintiff allegedly fell, and was negligent in not correcting it. The Appellant, in this argument, notes that Exxon was the landlord of Davis, and knew or should have known of the defective condition maintained on the land.

■ Generally, it may be stated that a landlord out of possession of its property is ordinarily not responsible for injuries sustained thereon by others. *Craig v. Ryan*, 201 Pa.Super. 307, 191 A.2d 711 (1963). Injuries caused by defects on the land while it is in the occupancy and control of a tenant are customarily the responsibility of the tenant. *McLaughlin v. Kelly*, 230 Pa. 251, 79 A. 552 (1911). However, a landlord out of possession may be held liable for bodily injuries sustained on his property if he maintains possession or control of the property. *Craig v. Ryan, supra.* It has also been stated that a landlord cannot escape liability if he is aware, or should have been aware, of the defective condition at the time of the leasing. *Dinio v. Goshorn*, 437 Pa. 224, 270 A.2d 203 (1969). Other exceptional circumstances under which a landlord out of possession may be liable for injuries to third persons include situations where the landlord lets the premises knowing that its condition constitutes

a nuisance, or when the letting is with the knowledge of a dangerous condition and the lessor knows that the premises will be used for public entertainment. See *Miller v. Atlantic Refining Company*, 393 Pa. 466, 143 A.2d 380 (1958). Unless we can find evidence which would place Exxon in one of the situations which constitute exceptions to the general rule, we must sustain the summary judgment granted to Exxon on this issue.

From our review of the available evidence, considered in a light most favorable to the Appellant, we believe that the record contains facts which mandate a reversal of the trial court's grant of summary judgment on this issue. We find that a jury question was presented as to whether Exxon should be held liable either because it maintained control over the premises, or because the slippery condition of the walk may have existed, and Exxon was aware of it or should have been aware of it, at the time of the initial leasing.

We shall first discuss the control issue. As discussed earlier in this Opinion, Exxon had provisions in its lease requiring Davis to maintain the property in an orderly condition. Specifically, the lessee agreed to " . . . keep the premises, including buildings, driveways and ramps in a clean, sanitary and orderly condition . . ." and to " . . . operate the business conducted on the premises in a safe and orderly manner, allowing no fire hazards, unsanitary or dangerous conditions to exist. . ." Mr. Anderson's affidavit states that Exxon employed representatives to inspect the premises for compliance with these sanitary requirements, and such persons would request that dealers eliminate any problems. Repeated violations of the sanitary standards, according to Anderson, would cause Exxon to refuse to offer the dealer a renewal of his lease. The record also contains copies of reports prepared by Exxon representatives evidencing such inspections on several occasions within ten to fourteen days prior to the Plaintiff's alleged fall. The Plaintiff testified in a deposition that she had noticed the accumulation of petroleum substances at the location of her fall on several occasions within the same time period. As

noted in our discussion of the respondeat superior issue, the record contains sufficient evidence of control by Exxon over Duke to justify the submission of that issue to the jury. It appears, from the evidence just described, that Exxon also exerted some degree of continuing control and it leased to Davis. Exxon maintained this control by frequent inspections, and apparently followed a practice with dealers of issuing orders to correct violations of lease terms, including those requiring that the property be kept in a neat and sanitary condition. According to the evidence, the slippery condition of the walk existed during a significant time period before Plaintiff's fall, and Exxon inspections occurred during that time. The evidence, while not clearly establishing liability, nevertheless does suggest possible liability if a jury were to find Exxon maintained control over the property and was negligent in its exercise of that control by allowing the substance to remain on the walk. We therefore believe that it was error for the lower court to rule, as a matter of law, that Exxon was entitled to summary judgment on the issue of its possible liability as a landlord maintaining control of the station premises.

In reaching that conclusion, we are aware of the decision of the Supreme Court in *Miller v. Atlantic Refining Co.*, a case we have cited earlier in this Opinion. *Miller* also involved a situation wherein a plaintiff suffered injuries in a fall on an oil-covered sidewalk abutting a service station, and sought to impose liability upon the petroleum products company which leased the station to an operator. The Supreme Court, adopting the lower court's opinion, sustained a judgment granted by the lower court in favor of the lessor, after a jury failed to reach a verdict and was discharged. The lower court determined that no evidence had been presented on which the jury could have based a finding that the defendant petroleum products company had, or should have had notice of the presence of the oil at the time of the plaintiff's fall. Significant in this conclusion was the clear evidence that the oil was *freshly* spilled on the sidewalk shortly prior to the fall. Moreover, while the lessor

in *Miller* also made periodic inspections of the premises, the factor of a retention of *control* by the landlord was not present. Thus, in our view, *Miller* is inapposite precedent under the facts presented in the instant case.

■ We also find that a jury question is presented on the question of whether or not Exxon bears potential liability because it may have leased the property at a time when the condition was existent and should have been known to Exxon, or was known to it. The lower court, in its opinion, states that Exxon leased the premises to Davis eleven months prior to the date of the Plaintiff's fall. Our own review of the record indicates that the then current lease term began on February 15, 1974, while the lease was actually executed by the parties on February 21, 1974. The Plaintiff's fall was alleged to have occurred on March 29, 1974, approximately five weeks later. The Plaintiff's deposition testimony indicates that she first noted the grease or oil on the sidewalk about two weeks prior to her fall. There was no evidence submitted by the Appellee to establish that the area of the fall was not covered by the grease or oil only a few weeks prior to that time, when the lease was initiated. While the Appellant did not present evidence indicating the existence of the accumulation at that time, or as to the subject of possible Exxon knowledge of it, we are not convinced that the record is so clear on the point as to justify a grant of summary judgment on the issue. The lower court's mistake as to the time period which had passed between the beginning of the lease and the Plaintiff's fall certainly creates the impression that it did not correctly consider the facts in granting the Appellee's Motion for Summary Judgment on this point. We believe it should not have done so, and find that the record establishes that issue as a disputed one, upon which the fact-finder shall ultimately rule.

Reversed and remanded for trial, in accordance with the rulings stated herein. This Court does not retain jurisdiction after remand.