In re HH(US), INC., f/k/a American Carbon & Metals Corporation, f/k/a Hofflinghouse & Co. (US), Inc., Debtor.

HH(US), INC., f/k/a American Carbon & Metals Corporation, f/k/a Hofflinghouse & Co. (US), Inc., Movant,

v.

BOZEL MINERACAO E FERROLIGAS, S.A., a Brazilian Company, Respondent.

BOZEL MINERACAO E FERROLIGAS, S.A., a Brazilian Company, Movant,

v.

Richard KEMPE, Receiver for Hofflinghouse & Co., Limited, a Bermuda Company, Respondent.

Bankruptcy No. 90–20815–JKF.

Motion Nos. 90–9700M, 91–1386M and 91–1385M.

United States Bankruptcy Court, W.D. Pennsylvania.

Dec. 9, 1994.

William H. Schorling, Amy M. Tonti, Klett Lieber Rooney & Schorling, P.C., Pittsburgh, PA, R. Paul Wickes, Joanna Shally, Shearman & Sterling, New York City, for Richard Kempe, Receiver For Hofflinghouse & Co., Ltd.

Paul A. Manion, James R. Walker, Manion, McDonough & Lucas, P.C., Pittsburgh, PA, for Bozel Mineracao e Ferroligas, S.A.

## MEMORANDUM OPINION

BERNARD MARKOVITZ, Bankruptcy Judge.

We are called upon in this proceeding to determine which of two competing claimants shall recover from debtor's estate for shipments of calcium silicon (hereinafter "CaSi") that Bozel Mineracao e Ferroligas (hereinafter "Bozel") produced and debtor HH(US) ultimately sold to its own customers.

Bozel and Richard Kempe, Receiver for Hofflinghouse & Company Limited (hereinafter "Limited"), have filed competing claims with respect to the same shipments of CaSi. Bozel's claim is in the amount of $4,527,-636.50. According to Bozel, debtor was acting as its agent when it sold the CaSi in question. The Receiver's total claim is in the amount $48,073,918.21, of which $5,844,392.12 represents amounts due for the identical shipments of CaSi subject to Bozel's claim. According to the Receiver, debtor purchased the CaSi from Limited and then sold it to its customers on its own behalf.

Debtor has objected to Bozel's claim. Debtor does not dispute that it owes someone for the CaSi but denies that it was acting as Bozel's agent when it sold the CaSi to its own customers. According to debtor, Bozel sold the CaSi to certain intermediaries from whom debtor then purchased it before selling it on its own behalf.

Bozel has objected to the Receiver's claim. Bozel denies that it sold the CaSi to these intermediaries and insists that debtor functioned as its agent when debtor sold the CaSi to its own customers.

For reasons set forth below, debtor's objection to Bozel's proof of claim will be sustained. Bozel's claim will be disallowed in its entirety. In addition, Bozel's objection to the Receiver's proof of claim will be overruled. That portion of the Receiver's claim pertaining to the CaSi at issue in this proceeding will be allowed.

### JURISDICTION

This action is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B) and (O). The facts relative to jurisdiction and/or venue are not in dispute.

## I

### FACTS

CaSi is a ferro alloy metal produced by a relative handful of companies throughout the world and is used in the steelmaking process. It is not traded by metals traders as a commodity but instead is marketed and sold to customers in the steel industry by the producers themselves or by their designated independent contractors.

Bozel is a Brazilian producer of CaSi. Its production facility is located in Sao Joao Del Ray, Minas Gerais, Brazil. From its inception in 1975 until December of 1983, Bozel was owned by Bozel Nobel, a French corporation. Bozel Nobel handled all of Bozel's export activities except for a handful of countries in South America.

Limited is located in Bermuda and was formed in 1982. It was engaged in sourcing, financing, transporting, and marketing ferro alloys, including CaSi, in North America, Asia, and Europe. Limited is a member of a group of companies known collectively as the Hofflinghouse Group.

Debtor HH(US) is located in Pittsburgh and also was incorporated in 1982. It is a wholly owned subsidiary of Limited.

Dieter Beckmann, a German national residing in London, founded and dominated the Hofflinghouse group at all relevant times. Atlantic Metals Limited and Century Marketing Limited also were part of the Hofflinghouse Group.

Cia Paulista Ferroligas is a Brazilian corporation that manufactures various ferro alloys and other metals. Although Paulista is a publicly-owned corporation, Joaquim Salles Leite Filho, its Director President, dominated and controlled it at all relevant times.

Palmac Administraco e Participacoes S.A., a joint venture of Paulista and another Beckmann-controlled company known as Commerzhouse, acquired Bozel in January of 1984.

Paulista owned fifty-one percent (51%) of Palmac. Commerzhouse owned the remainder. Although Paulista was the majority

owner of Palmac, Paulista and Commerzhouse had equal say in Palmac's management pursuant to an agreement.

Bozel was governed by an administrative council consisting of two Paulista representatives and two representatives of the Hofflinghouse Group. Salles Leite was chairman of Bozel's administrative council at all relevant times.

Because it had no experience marketing its CaSi overseas, Bozel had to designate some other entity to sell its product overseas after its acquisition by Palmac. Salles Leite and Beckmann agreed between themselves that Bozel should appoint Limited and its subsidiaries as Bozel's exclusive "agent" for overseas sales of its CaSi.

Nelson R. Spadini, Bozel's director of finance and administration, signed and sent the following letter to Limited on January 11, 1984:

"Dear Sirs:

He [sic] hereby wish to declare that as from january 1st 1984, we have appointed yourgoodselves, messrs HOFFLING-HOUSE & CO. LTD. and your subsidiaries as exclusive export agency for the material produced by us in our works in Sao Joao Del Ray, Minas Gerais–Brazil–."

The letter was drafted and transmitted to Spadini by an unidentified employee of Hofflinghouse in Brazil.

Before he signed the letter, Spadini contacted Salles Leite and Beckmann to verify its accuracy. Neither Spadini nor any other employee of Bozel knew of the agreement between Salles Leite and Beckmann before January 11, 1984.

Bozel was not the only Brazilian company with whom Hofflinghouse dealt. It also was "exclusive sales agent" for silicon carbide produced by Casil S.A., a wholly owned subsidiary of Paulista, and for various silicon metals produced by Camargo Correa Metais S.A.

Once it produced the CaSi, Bozel delivered it alongside a ship docked in the port of Rio de Janeiro for export to overseas markets. The documentation indicated legal title to the CaSi passed from Bozel to Atlantic or Century as soon as it was loaded onto the vessel in Rio de Janeiro.

The shipper delivered a bill of lading to Bozel that it forwarded to the designated "consignee", who then used the bill of lading to claim the CaSi at its final destination.

Between August 26, 1989, and November 7, 1989, Bozel invoiced Atlantic or Century for four shipments of CaSi that are the subject of the competing claims at issue in this proceeding. Each bill of lading stated that the shipper was "Bozel Mineracao e Ferroligas on behalf of Hofflinghouse & Co., Ltd.".

Bozel applied for an export license for each of these shipments. Atlantic or Century was listed on the license application as "importer" while Bozel was listed as "exporter".

The Hofflinghouse representative who participated in setting the price Hofflinghouse paid Bozel for its CaSi between June of 1984 and June of 1989 was Arnfinn Holaas, vice president of the ferro alloy division of the Hofflinghouse Group.

The CaSi Bozel produced was shipped directly to Limited's subsidiaries in the United States, Japan, and Europe. Atlantic, Century, and Limited never had actual possession of the goods. CaSi Bozel shipped to debtor HH(US) ordinarily was delivered to the port of New Orleans, Louisiana, where HH(US) took possession.

Documents evidencing several different sales were generated for each shipment of CaSi at issue in this proceeding. The invoice Bozel issued to Atlantic or Century indicated that Bozel had sold the goods to them. Bozel's audited financial statements for 1985 and 1988 declared that Bozel had sold specified percentages of its total production to Atlantic during those years.

Another invoice was issued indicating that Atlantic or Century had sold the goods to Limited, which then issued an invoice indicating that it in turn had sold them to HH(US).

One of the objectives of these transfers among the various Hofflinghouse entities was to maximize profits for Limited while allowing only nominal profits for HH(US). The net profits realized by Hofflinghouse Group at times approximated twenty percent (20%).

HH(US) was permitted to realize only a two percent (2%) profit on its sales to third parties. The remainder of the profits were realized offshore in Bermuda, where Limited was located.

The terms between Bozel and Atlantic or Century for shipments at issue here provided that payment was due ninety (90) days after delivery of the goods to the vessel in Rio de Janeiro. Payment was not contingent upon sale of the goods to third parties. Bozel never invoiced debtor for the CaSi shipped to it. Debtor never paid Bozel for any goods shipped to it.

During the relationship between Bozel and the Hofflinghouse Group, various members of the Group represented and promoted themselves to third parties as Bozel's exclusive export agent.

For instance, the 1988 edition of the Ferro Alloy Directory & Databook listed Limited as representing Bozel "on [an] agency basis". The publisher of the directory had circulated the information to be published therein to Limited in advance of publication for Limited's comment or correction.

An overview of the Hofflinghouse Group issued in May of 1988 described its relationship with Bozel as follows:

> We are the exclusive agent for the total calcium silicate production of our joint venture partner [Bozel]. Other products are sourced on a regular basis from factories with which we have long standing relationships and sole agency agreements.

A finance proposal summary Limited issued to prospective investors in February of 1989 stated that:

> Under an exclusive agency agreement, Hofflinghouse sells most of this material [Bozel's CaSi] to selective buyers in the U.S.

A private placement memorandum issued in July of 1989 by Hofflinghouse Finance Limited, through which it sought to raise $50,000,000.00 in debt financing, stated that:

> The Company also acts as exclusive producer agents of silicon carbide, silicon metal, and calcium silicon for Casil, Camargo Correa and Bozel, respectively.

A sales brochure prepared in 1989 for distribution to customers stated as follows:

> The [Hofflinghouse] Group has a wide range of partnerships throughout Brazil, which include joint venture ownerships of Bozel Mineracao e Ferroligas, S.A., for which the Group also is the exclusive export agent....

A document prepared for a ferro-alloy conference held in Monte Carlo in November of 1989 stated in part as follows:

> HOFFLINGHOUSE acts as Sales Agent for several Ferro Alloy Producers including:
>
> *BOZEL MINERACAO E FERROLIGAS S.A. BRAZIL*
>
> 50 pct. owned by Hofflinghouse
> HOFFLINGHOUSE has exclusive export
> agency for all products....

Holaas began campaigning as early as March of 1985 for the appointment by HH(US) of a sales representative with technical expertise. Bozel and Casil began pressing for the appointment of such a representative in 1987 or 1988. HH(US) initially was reluctant to do so but eventually relented and hired one in 1988 or 1989.

Limited, Bozel, and Japan Metals & Chemicals Company Limited executed an agreement in November of 1987 whereby Limited assigned its marketing rights for Bozel's CaSi in Japan to Japan Metals & Chemicals for a specified term. Bozel agreed on its part to continue supplying CaSi during the term of the agreement.

Subsequent thereto, a virtually identical draft agreement between Limited, Bozel, and Pickands Maher & Company was prepared wherein Limited agreed to assign its right to market Bozel's CaSi in the United States to Pickands Maher for a fixed term. Bozel, as in the other agreement, agreed on its part to continue supplying CaSi during the term of the agreement. Although the agreement was prepared in draft form, the parties thereto never executed it.

Paulista needed money in 1987 to expand its operations by purchasing a manganese alloy plant in Brazil. Salles Leite also need-

ed to solve an unspecified "personal problem". Salles Leite approached Hofflinghouse at that time about a loan to resolve these matters.

Salles Leite informed Holaas in September of 1987 after a board meeting of Paulista that all relationships between Paulista and Hofflinghouse would terminate unless Hofflinghouse arranged a loan. Holaas took this to mean that, among other things, the "exclusive export agency" with Bozel would end.

Beckmann met with Salles Leite upon hearing of the threat and arranged a loan of three million dollars to Salles Leite and Paulista. In return for the loan, Hofflinghouse Group entered into a supply agreement with Paulista for manganese alloys. Paulista reduced the price of its manganese alloys as a way of paying off the loan.

The threat to terminate all relationships between Paulista and the Hofflinghouse Group was withdrawn after Beckmann assured Salles Leite that he would arrange for the loan. There is no indication that any transactions between Paulista and the Hofflinghouse Group which otherwise would have occurred did not occur as a result of Salles Leite's threat.

Bozel began pressing Hofflinghouse after several years for information about Hofflinghouse's costs and the prices at which it sold Bozel's CaSi to ultimate customers. In response to the pressure, Hofflinghouse provided Bozel with such information for a brief time in 1988 and 1989 for selected vessels.

Hofflinghouse prepared the reports because it and Bozel were at loggerheads concerning the price Hofflinghouse should pay Bozel for its CaSi. Bozel was concerned about falling market prices for CaSi due to worldwide overproduction and wanted to maintain the price Hofflinghouse paid Bozel for its CaSi. Hofflinghouse was concerned about an increase in the duty imposed upon Bozel's CaSi sold in Europe from five percent (5%) to twenty-one percent (21%) and wanted to decrease the price it paid Bozel for its CaSi.

Hofflinghouse prepared three or four such reports and then unilaterally stopped doing so without any complaints or protests from Bozel.

The reports contained information about Hofflinghouse's costs for transportation, storage, insurance, duties, commissions, and finance costs; the price per ton paid to Bozel for particular shipments; the final price paid to Hofflinghouse by its customers; and the profit realized by Hofflinghouse. One of the reports indicates that the profits realized by Hofflinghouse Group on various shipments ranged between two percent (2%) and twenty-one percent (21%).

Included among the various costs was a "commission to shareholders" equal to seven percent (7%) of the difference between the final price paid to Hofflinghouse by its customers and the other costs incurred by Hofflinghouse.

Although Commerzhouse and Paulista were the shareholders of Palmac, which in turn owned Bozel, this "commission" was split equally between Beckmann and Salles Leite. Brazil was racked by hyperinflation at the time and had strict currency controls. To circumvent these controls, Salles Leite's share was deposited into the account of a corporation he controlled in the Netherlands Antilles. As far as can be determined, none of these payments ever reached the other shareholders of Paulista.

On December 21, 1989, Richard Kempe was appointed Receiver for Limited in Bermuda.

On January 4, 1990, Bozel notified Limited that it was revoking Limited's appointment as its exclusive export agent because Atlantic and Century had failed to pay for several shipments of CaSi and because Limited was unable to continue the relationship due to its being in receivership. The letter of termination made no reference to HH(US) and did not demand return of the CaSi or an accounting.

On February 20, 1990, debtor filed a voluntary chapter 11 petition in the Southern District of New York. The case was transferred to the Western District of Pennsylvania on March 22, 1990.

Bozel filed a claim as a general unsecured creditor in the amount of $4,527,636.50 on

August 14, 1990. Its claim pertains to fifty-four (54) lots of CaSi shipped to HH(US) between August and December of 1989.

The Receiver for Limited filed a claim as a general unsecured creditor in the amount of $48,073,918.21, of which $5,884,392.12 constitutes amounts allegedly due for the same 54 lots subject to Bozel's claim.

On January 18, 1991, debtor objected (at Motion No. 90–700M) to Bozel's claim. Debtor denies that it was acting as Bozel's agent when it sold the CaSi to its own customers. According to debtor, it sold the CaSi on its own behalf.

On February 20, 1991, Bozel objected (at Motion No. 91–1386M) to the Receiver's claim on behalf of Limited. Bozel argues that debtor, like Atlantic, Century, and Limited, was acting as its export agent when debtor sold the CaSi to its own customers.

## II

## ANALYSIS

### A) *ISSUE IN CASE*

The issue presented in this proceeding is whether debtor—i.e., HH(US)—was acting as Bozel's agent when debtor sold the above 54 lots of CaSi to its own customers or whether debtor sold it on its own behalf. Bozel maintains that debtor was acting as its agent and sold the CaSi on behalf of Bozel. Debtor HH(US) denies that it was acting as Bozel's agent and asserts that it bought and sold the CaSi on its own behalf.

### B) *APPLICABLE LAW*

■ Agency is a relationship wherein A manifests to B that B shall act on behalf of and subject to A's control and B consents to so act. *See Smalich v. Westfall,* 440 Pa. 409, 414, 269 A.2d 476, 480 (1970). Such a relationship exists only if there is an agreement for the creation of a fiduciary relationship with control by the beneficiary. *Id.* Because the relationship is fiduciary in nature, the agent has a duty of loyalty to act for the benefit of the principal. *See Sylvester v. Beck,* 406 Pa. 607, 610, 178 A.2d 755, 757 (1962).

■ There are two types of agency relationship. An agency may consist of a relationship between master and servant or between two independent contractors. *See Juarbe v. City of Philadelphia,* 288 Pa.Super. 330, 335, 431 A.2d 1073, 1075–76 (1981).

■ A principal who is a master has the right to control not only the result of the service performed by the servant but also has the right to control the manner in which the servant performs the service. The physical conduct of the servant is subject to the right of control by the master. *See Smalich,* 440 Pa. at 415–16, 269 A.2d at 481.

■ An agent who is an independent contractor retains control over the manner in which it renders service on behalf of the principal. The agent agrees only to use care and skill to accomplish a result and is subject to a fiduciary duty of loyalty to the principal. *Id.*

■ The basic elements of any agency are:

(1) a manifestation by the principal that the agent shall act for the principal;

(2) the agent's acceptance of the undertaking; and

(3) the understanding of the parties that the principal shall be in control of the undertaking.

*Scott v. Purcell,* 490 Pa. 109, 116, 415 A.2d 56, 60 (1980).

The difference between a purchaser and an agent normally is not difficult to ascertain. Question may arise, however, in certain situations where A sells goods to B for resale to C, whether the relationship between A and B should be treated as a buyer-seller or an agent-principal relationship.

■ The fact that B received goods from A for resale to C does not necessarily mean that B is A's agent for that purpose:

whether he is an agent for this purpose or is himself a buyer depends on whether the parties agree that his duty is to act primarily for the benefit of the one delivering goods to him or is to act primarily for his own benefit.

Restatement (Second) of Agency, § 14J (1958).

While it normally is the case that an agent will act to some degree to advance his own interests and that a buyer frequently will advance the interests of the seller in order to effectuate a resale, the *primary* distinction in this regard is between a fiduciary and a non-fiduciary. See Restatement (Second) of Agency, § 14J, *Cmt. a.*

■ The following factors, no one of which is dispositive, tend to indicate that the transaction is a sale rather than an agency:

(1) that the consignee gets legal title to and possession of the goods;

(2) that the consignee becomes responsible for an agreed upon price, either at once or when the goods are sold;

(3) that the consignee can fix the price at which he sells the goods without accounting to the transferor for the difference;

(4) that the goods are incomplete or unfinished and it is understood that the transferee shall make additions to them or complete the process of manufacture;

(5) that the risk of loss by accident is upon the transferee;

(6) that the transferee deals, or has a right to deal, with the goods of persons other than the transferor; and

(7) that the transferee deals in his own name and does not disclose that the goods are those of another.

*See* Restatement (Second) of Agency § 14J, *Cmt. b.*

### C) *BUYER–SELLER OR AGENT–PRINCIPAL RELATIONSHIP*

■ Application of the above factors to the facts of this case compels the conclusion that the Hofflinghouse Group was acting primarily for its own benefit and not primarily for Bozel's benefit when it sold the CaSi to third parties and, consequently, was *not* serving as Bozel's agent.

The first factor indicates a sale rather than an agency relationship. It is undisputed that legal title to the CaSi passed to Atlantic or Century as soon as it passed over the ship's railing in Rio de Janeiro.

The second factor also indicates that Hofflinghouse had bought the goods from Bozel and was not acting as Bozel's agent when it resold them. Atlantic or Century became obligated to pay Bozel a fixed price for the CaSi as soon as it was delivered to them in Rio de Janeiro.

Bozel relies heavily upon Holaas's testimony that he met periodically with officials of Bozel to set the price that Hofflinghouse paid to Bozel during the following quarter. According to Holaas, if the market price for CaSi decreased from projections for a given quarter, the price paid to Bozel by the Hofflinghouse Group was reduced in the next quarter to guarantee Hofflinghouse "risk-free" compensation.

Bozel's reliance upon this testimony is misplaced. Even assuming the accuracy of this testimony, the fact remains that Atlantic or Century became liable to Bozel for the price of a given shipment as soon as it was loaded on board the vessel. Any adjustment to the price paid to Bozel in the following quarter did not affect a shipment that already had been delivered to Atlantic or Century. They still remained liable to Bozel for the agreed upon price for that shipment.

The third factor also indicates that debtor was selling the CaSi on its own behalf and was not acting as Bozel's agent.

For a brief time during 1988 and 1989, Hofflinghouse provided Bozel with reports giving a vessel-by-vessel breakdown of Hofflinghouse's costs, the price it paid to Bozel for CaSi, the price at which Hofflinghouse sold the CaSi to its customers, and Hofflinghouse's profit on those sales. Hofflinghouse did *not*, however, provide the reports for the purpose of accounting to Bozel for the difference between the price it paid Bozel for the CaSi and the price it received when it sold the goods to its own customers. As was noted, the reports were prepared because Hofflinghouse and Bozel disagreed as to the price Hofflinghouse should pay Bozel for its CaSi. Bozel was concerned about falling market prices for CaSi due to overproduction and wanted to maintain the price it received from Hofflinghouse. Hofflinghouse, by contrast, was concerned about increased duties imposed on Bozel's CaSi in Europe and want-

ed to decrease the price it paid to Bozel. Hofflinghouse prepared three or four such reports and then unilaterally stopped doing so without any complaints from Bozel.

The fourth of the above factors points in favor of an agency relationship as opposed to a buyer-seller relationship. Production of the CaSi was completed by Bozel before it was delivered to Atlantic or Century. Hofflinghouse did nothing further to the CaSi except sell it to its own customers.

The fifth factor indicates that the relationship between Hofflinghouse and Bozel was that of buyer and seller and not that of agent and principal. The risk of loss by accident was upon Atlantic or Century as soon as the goods were loaded onto the ship. Had the goods been lost at sea, for instance, the loss would have fallen upon Atlantic or Century, who still would have been liable to Bozel for the agreed upon price. As was indicated earlier, Atlantic and Century were obligated to pay Bozel for the CaSi as soon as it was loaded on board the vessel, regardless of what became of the shipment. Hofflinghouse protected itself against the possibility of such accidental loss by insuring the cargo.

The fact that Bozel bore the loss for one shipment of CaSi shipped to debtor because it had been contaminated by industrial saboteurs in Brazil does not alter the conclusion that the risk of loss by accident was borne by Hofflinghouse. Bozel in that one instance merely was standing by its warranty as to the quality of its product.

The sixth factor strongly indicates that the relationship was that of buyer and seller rather than agent and principal. Hofflinghouse had the right to deal with the goods of other producers and was not limited to selling Bozel's CaSi. There is nothing to suggest that Hofflinghouse did not have the right to sell the products of others. Moreover, Hofflinghouse also was "exclusive export agent" for silicon carbide produced by Casil and for silicon metals, including CaSi, produced by Camargo Correa Metais.

Finally, the seventh factor also indicates a buyer-seller relationship rather than an agent-principal relationship. Although Hofflinghouse willingly advertised itself to its customers as the "exclusive sales agent" of Bozel, it did not represent to its customers that they were dealing with Bozel rather than Hofflinghouse when they purchased CaSi. Hofflinghouse dealt with its customers in its own name when it sold Bozel's CaSi to its customers.

The above factors on balance overwhelmingly indicate that Hofflinghouse primarily was advancing its own interests and was not acting in a fiduciary capacity when it sold Bozel's CaSi and therefore was not acting as its agent.

## D) *BOZEL'S RIGHT OF CONTROL*

The finding that the relationship between Hofflinghouse and Bozel was that of buyer and seller, respectively, is confirmed when we consider the above necessary elements for an agency.

 As essential element of any agent relationship is an understanding by the parties that the principal shall be in control of the undertaking. *See Scott*, 490 Pa. at 117, 415 A.2d at 60. Right of control is the "touchstone" of any agency relationship. *See Government of the Virgin Islands v. Richards*, 618 F.2d 242, 244 (3d Cir.1980).

The fact that HH(US) appointed a technical sales representative in 1987 or 1988 after Bozel urged it to do so does not evidence any right of control by Bozel over Hofflinghouse. As was noted, Holaas began campaigning for the appointment of a technical sales representative as early as March of 1985. Casil also urged the appointment of such a person. Although HH(US) at first was reluctant to do so, it eventually hired on in 1988 or 1989.

It would be an exaggeration to say that debtor hired a technical sales representative because Bozel insisted upon it and that this demonstrates Bozel's right of control. The decision to hire one primarily was the result of lobbying on Holaas' part. It is likely that one would have been appointed even in the absence of Bozel's pressure.

The fact that Bozel was a signatory to the agreement of November 12, 1987 wherein Limited assigned its marketing rights for Bozel's CaSi in Japan to Japan Metals & Chemicals Company does not evidence any

right of control over Hofflinghouse. Bozel was a signatory to the agreement because it too was a party thereto in that it agreed to supply CaSi during the term of the agreement at fixed prices.

Bozel's contention that its right of control is evidenced by its receipt of reports prepared by Hofflinghouse that provided information about its costs, the price it paid to Bozel, the price at which it sold the goods to its own customers, and its profit margin is without merit. As has been noted several times now, they were prepared not because Bozel demanded them but because Hofflinghouse and Bozel could not agree as to whether the price Hofflinghouse paid to Bozel for its CaSi should remain constant or be decreased.

Moreover, no such reports were prepared during the first several years of the relationship and were provided only three or four times before Hofflinghouse stopped preparing them. If Bozel had the right of control, it is unlikely that the reports would not have been issued from the outset and would have been discontinued by Hofflinghouse without any response from Bozel.

Bozel's contention that the announced termination of its relationship with Hofflinghouse in September of 1987 and the subsequent restoration of the relationship once Beckmann arranged a loan of $3,000,000.00 to Paulista and Salles Leite evidences Bozel's right of control also is lacking in merit.

It was not Bozel that supposedly terminated its relationship with Hofflinghouse. It was Salles Leite who informed Holaas that all relationships between Paulista and Hofflinghouse would terminate unless Hofflinghouse arranged a loan. The pressure that was brought to bear was not brought by Bozel, which had nothing to do with the threat to terminate all relationship between Paulista and Hofflinghouse, including the joint venture in Palmac, the relationship with Bozel, and the relationship with Casil. The threat to terminate "all relationships" was made by Salles Leite because he needed money to purchase a manganese alloy plant elsewhere in Brazil.

The evidence relied upon by Bozel, if it shows anything at all about agency, would apply only to Bozel and Limited. The issue in this case, however, is whether *debtor* was acting as Bozel's agent when it sold the CaSi. Even if Bozel did have the requisite right of control over Limited (which it did not), there is no evidence showing that it exercised such control over debtor.

The letter of January 11, 1984 appointing Limited and its subsidiaries as Bozel's "exclusive export agency" was drafted by a representative of Hofflinghouse and was sent to Spadini for his signature. Spadini, Bozel's director of finance and administration, knew nothing about the matter and contacted Salles Leite and Beckmann before signing the letter. Spadini did not even know that Hofflinghouse had a subsidiary in the United States when he signed the letter.

Except for a few isolated instances, contacts between Bozel and HH(US) were virtually nonexistent. Bozel did not consider debtor liable for the CaSi it sold to Atlantic and Century and never invoiced debtor for any shipments. All invoices were issued to Atlantic or Century. In addition, debtor never made any payments to Bozel for these shipments.

There is no evidence that debtor ever agreed to subject itself to Bozel's control or that Bozel in fact ever exercised any control over debtor. The only possible exception is Bozel's urging debtor to hire a technical sales representative. As was noted, however, this does not evidence any right of control on the part of Bozel. Debtor in all likelihood would have appointed a technical sales representative even if Bozel had not urged it to do so.

### E) USE OF THE WORD "AGENT" BY HOFFLINGHOUSE

Bozel makes much ado about the occurrence of the word "agent" in the appointment letter of January 11, 1984, and about Hofflinghouse's repeated use of the word "agent" in various documents it prepared to describe its relationship with Bozel to its customers. Its reliance is misplaced.

Agency is created as the result of conduct by various parties. *See* Restatement

(Second) of Agency § 1, *Cmt. b.* Subjective statements do not suffice. *See In re Singer Products Co., Inc.,* 102 B.R. 912, 927 (E.D.N.Y.1989). The finder of fact must look to the substance of the relationship. Talismanic language alone does not give rise to an agency. *Matter of Shulman Transport Enterprises, Inc.,* 33 B.R. 383, 185 (S.D.N.Y. 1983), *aff'd,* 744 F.2d 293 (2d Cir.1984).

We already have examined the substance of the conduct of Bozel and Hofflinghouse and have determined that it does not support a finding that Hofflinghouse was acting as Bozel's agent when it sold Bozel's CaSi to its own customers. The fact that certain language was used on occasion to describe that relationship does not alter the outcome.

 Agency is a *legal* concept. See Restatement (Second) of Agency § 1, *Cmt. b.* The fact that parties choose to call their relationship an "agency" does not mean that they are using the term to denote the legal concept previously described.

The decision to appoint Hofflinghouse as "agent" for Bozel was the result of discussions between Beckmann, a German national, and Salles Leite, a Brazilian. Beckmann can speak English. It is not known whether he can speak Portuguese. Salles Leite can speak Portuguese. It is not known whether he can speak English.

As far as can be determined, no one else was present when Beckmann and Salles Leite decided upon their relationship. It is not known what language(s) they spoke when they agreed that Hofflinghouse would serve as Bozel's "agent". Accordingly, it cannot be said with any degree of conviction that they even used the English word "agent" in their conversation or that they had in mind a relationship to which the legal concept of agency applies.

Moreover, as was noted, the letter of January 11, 1984, appointing Hofflinghouse as Bozel's "agent" was drafted by an unidentified Brazilian employee of Hofflinghouse. It is not known how well that individual understood English or whether they were referring to the legal concept of agency as it is understood in American jurisprudence. The

wording of the letter suggests that its scrivener had only a limited grasp of English.

Neither Bozel nor Hofflinghouse apparently intended to refer to the legal concept of agency when they used the word "agent" to describe their relationship. The most plausible interpretation of their usage of the term is that Hofflinghouse was Bozel's "agent" in that third parties wishing to obtain CaSi produced by Bozel could purchase it only from Hofflinghouse. Hofflinghouse was Bozel's "agent" in a non-legal sense. It was the exclusive intermediary from whom Bozel's CaSi could be obtained. This is a far cry from saying that it was Bozel' "agent" in the legal sense.

### F) *HOLAAS'S TESTIMONY*

Bozel's case rests in large measure upon testimony by Holaas. Among other things, Holaas testified that Beckmann told him that Beckmann and Salles Leite had agreed that Hofflinghouse would serve as Bozel's "agent" in selling Bozel's CaSi and that Hofflinghouse was to receive a five percent (5%) net commission as "risk-free compensation" for its services.

Hofflinghouse has objected to Holaas's testimony concerning what Beckmann, who did not testify at this trial, told him as inadmissible hearsay. Bozel insists that Holaas's testimony on these matters is admissible. According to Bozel, Beckmann's statements to Holaas are admissible pursuant to Federal Rule of Evidence 801(d)(2) as admissions by a party-opponent and pursuant to Federal Rule of Evidence 804(b)(3) as statements against interest.

Bozel unquestionably has offered Holaas's testimony concerning what Beckmann told him to prove the truth of the matter asserted therein. Serious question exists as to the admissibility of these statements. In fact, it could be argued that Beckmann, as a principal of Commerzhouse, which corporation owned fifty percent (50%) of the corporation that acquired Bozel in January 1984, would enjoy an economic advantage if Bozel's claim were sustained. Accordingly, his statement could be shown to be self-serving rather than an "admission" or "declaration against inter-

est". We need not, however, decide this issue.

Holaas's testimony, even if allowed, does not establish that debtor was acting as Bozel's agent when it sold Bozel's CaSi to its customers. Despite anything that Beckmann may have told Holaas, the evidence as a whole overwhelmingly indicates that debtor sold Bozel's CaSi on its own behalf and was not acting as Bozel's agent when it did so. Bozel did not have the requisite control over debtor for there to exist an agency as a legal concept.

Moreover, Holaas's testimony that Beckmann told him that Hofflinghouse was to receive "risk-free" net compensation of five percent (5%) for its services does not square with the fact that the net profit realized by Hofflinghouse varied from shipment to shipment and ranged between two percent (2%) and nearly twenty percent (20%).

Also, no one within the executive management of Bozel had any knowledge regarding payment of a commission to Hofflinghouse. Spadini, Bozel's director of finance and administration, denied that Bozel ever paid Hofflinghouse a commission in connection with the sale of Bozel's CaSi. Peter Marshall, the Hofflinghouse employee who was responsible for purchases of CaSi from Bozel, knew nothing about an arrangement whereby Hofflinghouse would receive a commission from Bozel. No cash remittance in the form of a commission was ever made to Hofflinghouse for sales of Bozel's CaSi. It defies belief that these individuals would have no knowledge of a commission arrangement if one existed.

Finally, the course of conduct between Bozel and Hofflinghouse belies any contention that Hofflinghouse was to receive a commission for its services. Hofflinghouse's arrangement with Bozel was altogether different from its arrangements with Camargo and Casil, from whom it was paid on a commission basis.

Hofflinghouse paid Camargo and Casil for their products on the basis of an estimated price that Hofflinghouse would receive from its own customers. After Hofflinghouse sold their products to its own customers, a recon-ciliation took place whereby Camargo and Casil ensured that Hofflinghouse had realized only its agreed upon commission. No such reconciliation ever took place between Bozel and Hofflinghouse. Bozel never complained to Hofflinghouse about any failure to reconcile, as it surely would have done had there been a true commission arrangement.

An appropriate order sustaining the Receiver's objection to the claim of Bozel and allowing the Receiver's claim shall be entered.