J-E03001-24

2025 PA Super 28

| | | |
|---|---|---|
| CLARENCE DAVID CORYELL, AND SANDRA CORYELL, H/W | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| STEVEN MORRIS, JASON DAWSON, ROBIZZA, INC., AND DOMINO'S PIZZA LLC | : | |
| | : | No. 1977 EDA 2021 |
| APPEAL OF: DOMINO'S PIZZA LLC | : | |

Appeal from the Judgment Entered September 21, 2021
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s): 180602732

BEFORE: LAZARUS, P.J., BOWES, J., OLSON, J., KUNSELMAN, J., NICHOLS, J., MURRAY, J., KING, J., BECK, J., and LANE, J.

OPINION BY BOWES, J.:                    **FILED JANUARY 31, 2025**

Domino's Pizza LLC ("Domino's") appeals from the judgment entered against it, its franchisee Robizza, Inc. ("Robizza"), and Robizza's employee, Steven Morris, and in favor of Clarence David Coryell and his wife, Sandra Coryell. We affirm.

On July 27, 2016, Mr. Morris, while delivering Domino's pizzas for Robizza, made a left turn into Mr. Coryell, who was on his motorcycle. Mr. Coryell suffered such severe injuries to his leg that, despite ten surgeries to repair the damage, amputation was deemed the most likely option to manage his pain and increase his mobility.

The Coryells filed the instant action in 2018 against Mr. Morris, Robizza, and Domino's, stating claims of negligence and loss of consortium.[1]   Both Domino's and the Coryells moved for summary judgment on the issue of the liability of Domino's for Mr. Morris's negligence.[2]   The Coryells asserted that the Domino's standard franchise agreement, which Robizza executed in 2006 ("Franchise Agreement"), allowed Domino's such authority to control the operation of Robizza that Domino's was vicariously liable for Robizza's negligence.   Domino's, on the other hand,  contended that the control it had pursuant to the Franchise Agreement and its operating standards merely protected the quality of the end product, not the day-to-day operation of the franchise.   The trial court, concluding that there remained genuine issues of material fact to be decided by the jury, denied both motions.

At trial, Domino's moved for a compulsory nonsuit at the close of the Coryells' case, again asserting that they had failed to prove that Domino's had the right to control, or exerted actual control over, Robizza's operations such that it was vicariously liable for Robizza's negligence.   The trial court denied the motion.  *See* N.T. Trial, 8/10/21, at 51-69, 88.  Ultimately, the jury found

---

[1] The Coryells also sued Jason Dawson, Robizza's principal and the owner of the vehicle that Mr. Morris was driving at the time of the collision, but they withdrew the claims against Mr. Dawson at trial.  *See* N.T. Trial, 8/10/21, at 91.

[2] Robizza's liability for its employee, Mr. Morris, does not appear to have been disputed.

that Mr. Morris negligently caused the collision and that Domino's "exercised or had the right to exercise sufficient control over [Robizza] such that [Domino's was] vicariously liable" for the Coryells' damages in the amount of $2,109,553. **See** Verdict Sheet, 8/13/21, at 1. Domino's filed a timely post-trial motion requesting judgment notwithstanding the verdict ("JNOV") as to the question of its vicarious liability, while the Coryells filed a motion for delay damages. The trial court denied the former and granted the latter, setting the new damages total at $2,337,279.41. The Coryells entered judgment on the verdict in that amount, and Domino's promptly filed a notice of appeal. Thereafter, both Domino's and the trial court complied with Pa.R.A.P. 1925.

Domino's raised the following questions for appellate review:

I. Whether the trial court erred in denying Domino's motion[3] for summary judgment.

Il. Whether the trial court erred in denying Domino's motion for compulsory nonsuit at the conclusion of [the Coryells'] evidence at trial.

III. Whether the trial court erred in denying Domino's post-trial motion for [JNOV].

Domino's brief at 4 (unnecessary capitalization omitted).

A split panel of this Court reversed, ruling (1) the denial of Domino's pre-trial motion for summary judgment ("MSJ") was reviewable on an appeal

---

[3] As is seen here, Domino's has opted to use its already-possessive name to modify nouns without additional indicia of possession. For the sake of consistency and readability, we do the same.

from the judgment entered on a jury verdict since the precedent was not uniform on that question, and (2) Domino's did not have control over the operation of Robizza sufficient to make it vicariously liable for negligence attributable to Robizza or its employee.[4]

The Coryells filed a timely motion for reargument *en banc*. This Court granted the motion by order of January 9, 2024, thereby withdrawing the panel opinions. The parties filed substituted briefs and presented argument to the *en banc* panel on November 6, 2024.[5] Hence, the case is ripe for disposition.

Domino's first challenges the order denying its pretrial MSJ on the issue of vicarious liability. Hence, our initial task is to determine whether that order is reviewable on this appeal. When this Court has squarely addressed the issue, we have held that the propriety of the denial of a fact-dependent pretrial MSJ is mooted by the resolution of the issue at trial, and the proper question on appeal is instead whether the trial court erred in denying JNOV. ***See Turnpaugh Chiropractic Health & Wellness Ctr., P.C. v. Erie Ins. Exch.***, 297 A.3d 404 (Pa.Super. 2023) (holding propriety of the MSJ denial where the plaintiff failed to produce an expert report was mooted by the production of

---

[4] The author of this opinion dissented, opining that the trial court's ruling on the MSJ was mooted by the trial and that Domino's was not entitled to JNOV because the evidence of control was sufficient to sustain the verdict.

[5] As noted at argument, this was an historical occasion, as it was the first time an *en banc* panel of this Court was composed of all female judges.

- 4 -

an expert at trial); ***Xtreme Caged Combat v. Zarro***, 247 A.3d 42 (Pa.Super. 2021) (rejecting challenge to denial of the plaintiff's pretrial MSJ to which the defendant did not respond because the trial record mooted the issue); ***Whitaker v. Frankford Hospital***, 984 A.2d 512 (Pa.Super. 2009) (ruling MSJ as to causation was mooted by trial).[6]

Nonetheless, this Court and our Supreme Court have at times reviewed the merits of a pretrial MSJ in appeals from judgments entered upon verdicts without considering the propriety of that review. ***See Woodford v. Insurance Department***, 243 A.3d 60 (Pa. 2020) (deciding the issue of whether the ***Nanty-Glo*** rule applies to summary judgment in administrative proceedings); ***Windows v. Erie Ins. Exch.***, 161 A.3d 953 (Pa.Super. 2017) (addressing whether the trial court erred in holding that the denial of a pretrial MSJ on the basis of the ambiguity of an insurance policy exclusion was the law of the case); ***Krepps v. Snyder***, 112 A.3d 1246 (Pa.Super. 2015) (reviewing

---

[6] An unusual procedural posture caused this Court to distinguish ***Whitaker*** and ***Xtreme Caged Combat*** in ***Yoder v. McCarthy Constr., Inc.***, 291 A.3d 1 (Pa.Super. 2023), *appeal granted*, 318 A.3d 757 (Pa. 2024). The issue on appeal in ***Yoder*** was whether the trial court improperly denied JNOV because the defendant was entitled to statutory-employer immunity under the Worker' Compensation Act. The trial court ruled against the defendant on that issue at the summary judgment stage, but also did not allow the defendant to litigate the question of immunity at trial. We held that it was appropriate under those circumstances to consider the MSJ record when reviewing the denial of JNOV, explaining: "Because the trial court did not permit [the defendant] to raise the statutory-employer defense at trial, we are persuaded by [its] argument that this Court's rulings in ***Whitaker*** and ***Xtreme Caged Combat*** do not apply to this matter and do not require us to consider only the jury trial record." ***Yoder***, 291 A.3d at 14 n.15.

the propriety of the denial of pretrial summary judgment due to the existence of unresolved issues of fact); **Ramsay v. Pierre**, 822 A.2d 85 (Pa.Super. 2003) (deciding whether statute-of-limitations MSJ was properly denied).

However, because the question of the reviewability of the denial of pretrial MSJs was not raised, argued, or adjudicated in **Ramsay**, **Krepps**, **Windows**, or, most importantly, **Woodford**, none of those cases is binding authority for the proposition that the MSJ denials are reviewable after trial. **See Commonwealth v. Burke**, 261 A.3d 548, 551 (Pa.Super. 2021) ("*Stare decisis* 'only applies to issues actually raised, argued, and adjudicated, and only where the decision was necessary to the determination of the case. The doctrine is limited to issues litigated and necessarily decided, it does not apply to *dicta* or *obiter dicta*.'" (quoting **In re L.J.**, 79 A.3d 1073, 1081 (Pa. 2013)).

In order to ease any lingering confusion among the bench and bar, and to ensure consistency in the treatment of similarly-situated litigants, we hold that **Whitaker**, **Xtreme Caged Combat**, and **Turnpaugh** accurately state the law of this Commonwealth. Specifically, a trial court's denial of a fact-dependent pretrial MSJ is not reviewable when the issue was subsequently resolved at trial.[7] Rather, the proper question on appeal is whether the trial

---

[7] Where the matter at issue in a pretrial MSJ is a pure question of law, the prevailing reason for precluding post-verdict review of the denial of a motion for summary judgment, *i.e.*, the preeminence of the trial record, would be diminished significantly. Since, as we discuss *infra*, the nature of the relationship between a franchisor and franchisee is a mixed question of law
*(Footnote Continued Next Page)*

court erred in denying JNOV. To the extent that **Ramsay**, **Krepps**, and **Windows** suggested otherwise, they are no longer good law.

Applying this to the case at hand, Domino's asserted in its pretrial MSJ that it was entitled to judgment as a matter of law because the Coryells had "not produced any evidence or documents to support the allegations in their Amended Complaint against [Domino's]." Domino's Motion for Summary Judgment, 3/2/20, at ¶ 44. Citing not only the Franchise Agreement and the most recent operating standards from 2016, but also the affidavits and depositions of its employees and the franchisee, Domino's maintained that "the evidence and documents produced show that [Domino's] has never had any right to, nor did it ever participate in the hiring, training and/or supervising of the individuals [that Robizza] employed," and thus "[t]he

---

and fact, the reviewability of a pretrial MSJ on issues that are not fact-dependent, and the necessity to preserve such claims in post-trial motions, is not before us.

We note that in federal court, where the denial of fact-dependent MSJs are also not reviewable post-trial, no post-trial motion is necessary to preserve for appellate review a purely legal issue that was resolved in pretrial summary judgment proceedings. **Compare Ortiz v. Jordan**, 562 U.S. 180, 183-84 (2011) ("May a party . . . appeal an order denying summary judgment after a full trial on the merits? Our answer is no. The order retains its interlocutory character as simply a step along the route to final judgment." (cleaned up)); **with Dupree v. Younger**, 598 U.S. 729, 731 (2023) (declining to extend **Ortiz**'s requirement that issues unsuccessfully challenged on summary judgment must be raised in a post-trial motion to be reviewable on appeal to "issues that can be resolved without reference to any disputed facts," because "there is no benefit to having a district court reexamine a purely legal issue after trial, because nothing at trial will have given the district court any reason to question its prior analysis").

evidence simply does not indicate any liability for this motor vehicle accident on the part of [Domino's]." *Id*. at 47- 48.

Hence, Domino's moved for summary judgment on the basis that the Coryells failed to produce evidence that established the vicarious liability of Domino's, and, after the motion was denied, the case proceeded to trial on the same claim raised in the summary judgment motion. Thus, the propriety of the trial court's denial of the MSJ is moot.[8]

Under well-settled law, Domino's second question on appeal, concerning the trial court's denial of its motion for a compulsory nonsuit, is also moot. *See*, *e.g.*, *Shapiro v. City of Philadelphia*, 159 A. 29, 30 (Pa. 1932) ("There is no legal right to a nonsuit after plaintiff has rested his case, nor can the failure to grant it be assigned as error."); *Churilla v. Barner*, 409 A.2d 83, 85 (Pa.Super. 1979) ("[I]t has long been settled law in this Commonwealth that no appeal lies from the refusal to grant a compulsory non-suit.").

Accordingly, we turn to Domino's remaining question: whether the trial court erred in denying its post-trial motion for JNOV. The following legal principles guide our review:

> A [JNOV] can be entered upon two bases: (1) where the movant is entitled to judgment as a matter of law; and/or, (2) the evidence was such that no two reasonable minds could disagree that the verdict should have been rendered for the movant. When reviewing a trial court's denial of a motion for [JNOV], we must

---

[8] If Domino's wished to seek appellate review of the denial of its MSJ before trial, it could have sought permission to file an interlocutory appeal pursuant to 42 Pa.C.S. § 702(b). *See Turnpaugh*, 297 A.3d at 41.

consider all of the evidence admitted to decide if there was sufficient competent evidence to sustain the verdict. In so doing, we must also view this evidence in the light most favorable to the verdict winner, giving the victorious party the benefit of every reasonable inference arising from the evidence and rejecting all unfavorable testimony and inference. Concerning any questions of law, our scope of review is plenary. Concerning questions of credibility and weight accorded the evidence at trial, we will not substitute our judgment for that of the finder of fact. If any basis exists upon which the trial court could have properly made its award, then we must affirm the trial court's denial of the motion for [JNOV]. A [JNOV] should be entered only in a clear case.

*Garced v. United Cerebral Palsy of Philadelphia & Vicinity*, 307 A.3d 103, 113–14 (Pa.Super. 2023) (cleaned up).

Thus, if an issue is fact-dependent, we conduct a deferential review. If we decide a pure question of law, we are not bound by the trial court's ruling. However, not all claims fall entirely within one category or the other, but rather some claims constitute mixed questions of law and fact.

When the determination of whether a legal threshold or definition has been met varies from case to case, with the answer depending upon the particular set of facts involved, then the issue is a mixed question of law and fact. *See*, *e.g.*, *J.S. by M.S. v. Manheim Twp. Sch. Dist.*, 263 A.3d 295, 305 n.11 (Pa. 2021) (noting whether a statement constitutes a punishable true threat is a mixed question of law and fact); *Messina v. E. Penn Twp.*, 62 A.3d 363, 366 (Pa. 2012) (observing that issue of whether an ordinance was invalid based upon failure to readvertise after changes were made to a zoning map presented mixed questions of law and fact); *Gentex Corp. v. W.C.A.B. (Morack)*, 23 A.3d 528, 534 (Pa. 2011) (concluding that question

of adequate notice presented a mixed question of law and fact and, "[a]s this issue is significantly fact driven, great deference is to be given to the lower tribunal's determinations"); **Commonwealth v. Crawley**, 924 A.2d 612, 615–16 (Pa. 2007) (holding that whether a petitioner fit the definition of "mental retardation" was a fact-intensive mixed question of law and fact).

The standard of review for mixed questions of law and fact "must be evaluated on an issue-by-issue basis" because "some mixed questions are more heavily weighted toward fact, while others are more heavily weighted towards law." **Id**. at 615. "The more fact intensive a determination is, the more deference a reviewing court should give the conclusion below." **Id**. at 615-16.

The issue before us is whether Domino's was properly determined to be vicariously liable for the negligence of its franchisee's employee. As our Supreme Court has explained:

> Vicarious liability, sometimes referred to as imputed negligence, means in its simplest form that, by reason of some relation existing between A and B, the negligence of A is to be charged against B although B has played no part in it, has done nothing whatever to aid or encourage it, or indeed has done all that he possibly can to prevent it. Once the requisite relationship (*i.e.*, employment, agency) is demonstrated, the innocent victim has recourse against the principal, even if the ultimately responsible agent is unavailable or lacks the ability to pay.

**Green v. Pennsylvania Hosp.**, 123 A.3d 310, 316 (Pa. 2015) (cleaned up).

In determining whether the relationship between two parties triggers vicarious liability, the focus is on the control that the purported principal has

- 10 -

over the purported agent "with respect to his physical conduct in the performance of the services for which he was engaged[.]" **Cox v. Caeti**, 279 A.2d 756, 758 (Pa. 1971).

> The hallmark of an employee-employer relationship is that the employer not only controls the result of the work but has the right to direct the manner in which the work shall be accomplished; the hallmark of an independent contractee-contractor relationship is that the person engaged in the work has the exclusive control of the manner of performing it, being responsible only for the result[.]

**Green v. Indep. Oil Co.**, 201 A.2d 207, 210 (Pa. 1964). Phrased differently, "[a] servant is an agent whose physical conduct in the performance of the service is controlled or is subject to the right of control by the master; that is, a master controls not only the results of the work, but the manner in which the work is to be performed." **Juarbe v. City of Philadelphia**, 431 A.2d 1073, 1076 (Pa.Super. 1981). "It is the element of **continuous subjection** to the will of the principal which distinguishes the agency agreement from other agreements." **Myszkowski v. Penn Stroud Hotel, Inc.**, 634 A.2d 622, 626 (Pa.Super. 1993) (cleaned up, emphasis in original).

In the context of a franchisor-franchisee relationship, the question of the agency is answered by examining "whether the alleged master has day-to-day control over the manner of the alleged servant's performance." **Id**. If an agreement gives the principal the right to control the agent's day-to-day performance, then it matters not whether the principal actually exercised that right. **See Coleman v. Bd. of Ed. of Sch. Dist. of Philadelphia**, 383 A.2d

1275, 1279 (Pa. 1978) ("The test is thus framed in terms of the right and power to exercise such control, not in terms of whether the right and power were actually exercised or whether they were delegated to another."). However, evidence of actual control exerted by the principal outside of the parties' agency agreement may also establish a level of control that gives rise to vicarious liability. **See George v. Nemeth**, 233 A.2d 231, 233 (Pa. 1967) ("Although the Distribution Agreement signed by Nemeth and Freihofer specifically refers to their relationship as being one of an independent contractor, this is not determinative of the matter for it is the actual practice between the parties which is crucial.").

Asserting that these precedents are inapt, Domino's maintains that its vicarious liability for Robizza's negligence is a purely legal question subject to *de novo* review. Domino's recognizes that vicarious liability examines both (1) the right to control, regardless of whether the right was actually exercised, and (2) the exercise of actual control, whether or not doing so was within the franchisor's rights. **See** Domino's supplemental reply brief at 4-5. It argues that in this case, the rights of the parties were established solely by the Franchise Agreement, and the witnesses all testified that Domino's exercised no control over Robizza beyond the terms of the agreement.[9] **Id**. at 4.

_____

[9] Domino's suggests that, because the Coryells themselves claimed at the summary judgment phase that the Franchise Agreement entitled them to judgment as a matter of law, they took an inconsistent position in claiming
*(Footnote Continued Next Page)*

Therefore, Domino's contends that the trial court should have decided the issue as a matter of law.

We disagree. Notably, having a jury determine the existence of vicarious liability is hardly a rarity. Quite the opposite, "[**o**]**rdinarily**, the question of the existence of a principal-agent or master-servant relationship is one of fact for the jury to determine." ***Breslin by Breslin v. Ridarelli***, 454 A.2d 80, 82 (Pa.Super. 1982) (emphasis added). Pennsylvania Courts have long and oft approved submitting to the jury the question of the existence of a master-servant or principal-agent relationship. ***See***, ***e.g.***, ***Tonsic v. Wagner***, 329 A.2d 497, 501 (Pa. 1974) (holding the question of whether a hospital, in addition to operating surgeon, was liable as a master for the negligence of its personnel during an operation involved "issues of fact which should have been submitted to the jury with proper instructions"); ***Brown v. Shirks Motor Exp.***, 143 A.2d 374, 379 (Pa. 1958) (concluding the trial court properly assigned to the jury the question of whether tortfeasor was working in the course and scope of his employment with his employer at the time of his negligence or he had been under control of a different master); ***Kissell v. Motor Age Transit Lines***, 53 A.2d 593, 596 (Pa. 1947) (same); ***Rosen v.***

_____

that the issue was for the jury to resolve. **See** Domino's supplemental reply brief at 5-6. We perceive no inconsistency. Since the Coryells could prevail based on either the terms of the agreement **or** upon on the actual relationship, their assertion that they were entitled to judgment as a matter of law based upon the former is not incongruous with maintaining that the totality of control was properly submitted to the jury.

***Diesinger***, 158 A. 561, 562 (Pa. 1932) (same); ***Consol. Rail Corp. v. ACE Prop. & Cas. Ins. Co.***, 182 A.3d 1011, 1027 (Pa.Super. 2018) (reversing grant of summary judgment because whether a principal-agent relationship existed presented a jury question); ***Lynn v. Cepurneek***, 508 A.2d 308, 316 (Pa.Super. 1986) ("Where, as here, it is not entirely clear who was the controlling master and different inferences in that regard can fairly be drawn from the evidence, it is for the jury, not the court, to determine agency.") (quoting ***Dunmire v. Fitzgerald***, 37 A.2d 596, 599 (Pa. 1944) (cleaned up)); ***Simmons v. St. Clair Mem'l Hosp.***, 481 A.2d 870, 874 (Pa.Super. 1984) (holding trial court erred in not permitting the jury to determine the relationship between the parties for, while the evidence of agency "may have been tenuous," there was a factual dispute for the jury).

Further, it is well-settled that "[i]f the facts as to such relationship are in dispute, it is the function of a jury to determine the precise nature of the relationship between the parties[.]" ***Cox***, 279 A.2d at 758 (citing ***Feller v. New Amsterdam Cas. Co.***, 70 A.2d 299, 300 (Pa. 1950)). ***See also Juarbe***, 431 A.2d at 1076 (same). It is only "where the facts are not in dispute, [that] the question of the relationship becomes one for determination by the court[.]" ***Cox***, 279 A.2d at 758.

Upon review of the certified record, we conclude that the trial court properly tasked the jury with deciding whether Domino's had *de facto* or *de jure* control over Robizza such that Robizza was the agent of Domino's for

purposes of vicarious liability. Indeed, a review of Domino's motion for JNOV and the Coryells' response readily reveals the conflicting facts presented at trial.

In arguing that it was entitled to judgment notwithstanding the jury's contrary verdict, Domino's contended that the evidence at trial was not "sufficient to sustain the jury's verdict . . . finding that Domino's, as a franchisor, is vicariously liable for the acts or omissions of the employees of its franchisee, Robizza[.]" Motion for Post-Trial Relief, 8/23/21, at 2. Asserting that there was no proof that Domino's had a right to control, or actually exercised control over, the day-to-day operations of the franchise, Domino's cited the Franchise Agreement; the trial testimony of Mr. Dawson; the trial testimony of Jason Devereaux, Domino's director of franchise services; and the video deposition of January Shook, the Domino's area leader responsible for enforcing the Franchise Agreement with Robizza.

Domino's highlighted provisions of the Franchise Agreement that: (1) placed sole responsibility for training employees with the franchisee; (2) indicated no modifications to operating standards would alter the franchisee's status under the agreement; (3) stipulated that the franchisee must directly supervise the store; and (4) identified the parties as independent contractors. *Id*. at 10 (citing, *inter alia*, Franchise Agreement, 8/15/06, at ¶¶ 10.2, 15.4, 15.6, 22.8). Regarding that last point, ¶ 22.8 of the Franchise Agreement defined the parties' relationship as follows:

The parties to this Agreement are independent contractors and no training, assistance or supervision which we may give or offer to you shall be deemed to negate such independence or create a legal duty on our part. We shall not be liable for any damages to any person or property arising directly or indirectly out of the operation of the Store, including but not limited to those damages which may occur while your employees are making or returning from making deliveries, or arising out of your delivery service policies. Nor shall we have any liability for any taxes levied upon you, your business, or the Store. The parties further acknowledge and agree the relationship created by this Agreement and the relationship between us is not a fiduciary relationship nor one of principal and agent. Furthermore, we have no relationship with your employees and have no rights, duties, or responsibilities with regard to their employment by you. You acknowledge and agree that you do not have the authority to act for or on behalf of us or to contractually bind us to any agreement. No party to this Agreement shall have any authority to assume any liability for the acts of the other, or to alter the legal relationships of the other. . . .

Franchise Agreement, 8/15/06, at ¶ 22.8.

Domino's further cited Mr. Dawson's testimony that he "at all times solely owned Robizza and operated it 'as an independent business[;]'" that "Robizza leased the premises and paid all of its own bills, expenses, and taxes[;]" and that all of the food was "made from ingredients owned by Robizza in equipment that Robizza owned and [was] sold at prices set by Robizza directly to its customers." Motion for Post-Trial Relief, 8/23/21, at 6 (quoting N.T. Trial, 8/4/21(AM), at 71, 82-88, 97-100). Domino's also relied upon Ms. Shook's testimony in asserting that Domino's never had an employee working at the store that "Mr. Dawson exclusively recruited, hired, trained, scheduled, supervised, and paid all of Robizza's employees" because Robizza was solely responsible for those matters, and that "Domino's was only present

in the Robizza store three to five times a year for approximately an hour at a time for a quality review of Robizza's operations." *Id*. at 6-7 (citing Videotaped Deposition of January Shook, 7/27/21, at 72, 86-103). Domino's additionally highlighted Mr. Devereaux's testimony contrasting the operation of Robizza's store from those owned by Domino's. In particular, Mr. Devereaux indicated that all of the employees, including drivers, in corporate-owned stores are directly hired, trained, and supervised by Domino's. *Id*. at 7 (citing N.T. Trial, 8/5/21(AM), at 43-44).

In their response to Domino's motion for JNOV, the Coryells pointed to testimony from these same witnesses suggesting that, despite all the declarations of Robizza's independence, Domino's had the right to, and did, dictate not just the results that Robizza produced, but also the precise manner in which Robizza achieved them. For example, Mr. Dawson and Ms. Shook both testified that Domino's had the right pursuant to the Franchise Agreement to set standards that Robizza was mandated to follow. *See* Brief in Opposition to Post-Trial Motion, 9/13/21, at 14 (citing N.T. Trial, 8/4/21(AM), at 50-51; Videotaped Deposition of January Shook, 7/27/21, at 24-25). Mr. Devereaux attested that Domino's exercised its contractual right by adopting not only product standards to ensure the quality of food associated with the Domino's brand, but operating standards that mandated how Robizza would run its store. *Id*. at 14-15, 22 (citing N.T. Trial, 8/5/21(AM), at 9-16). These standards could be changed by Domino's at any

time, without Robizza's approval, to dictate Robizza's operations. *Id*. (citing N.T. Trial, 8/5/21(AM), at 13-14). Specifically, Domino's issued operating standards in July 2016, nearly ten years after the parties entered into the Franchise Agreement, by which Robizza was required to abide. *Id*. (citing N.T. Trial, 8/5/21(AM), at 13; Videotaped Deposition of January Shook, 7/27/21, at 8). Mr. Dawson testified that these standards governed the day-to-day operations of the Robizza store. *Id*. at 21 (citing N.T. Trial, 8/4/21(AM), at 99).

Along with this testimony, the Coryells introduced the fifty-page 2016 operating standards. This document provided rules governing such extensive areas of operation as how long employees' fingernails and facial hair could be; the size and amount of employees' jewelry; when the store must be cleaned and what types of supplies were permitted; methods of acceptable payment by customers; what topics must be covered in employee training; how much cash, including personal funds, drivers were permitted to carry in the delivery vehicles; and that drivers not carry mace or other types of personal protection in the delivery vehicles. *Id*. at 17-20.

The above demonstrates that there was conflicting evidence of the nature of Robizza's relationship with Domino's such that it was for the jury to evaluate that evidence and decide, upon applying the trial court's instructions as to the law, whether Domino's actually exerted, or had the authority to exert, control over the day-to-day operations of the Robizza Domino's store

to make Domino's vicariously liable for the negligence of a Robizza employee.[10]

Turning to the question of whether Domino's was entitled to JNOV, our review of the record reveals the jury's verdict to be contrary to neither the law nor the evidence. The Franchise Agreement and 2016 operating standards left Robizza with practically no discretion how to conduct the day-to-day operations of its franchise store. In addition to the mandates discussed above, Domino's also: (1) specified the terms of the store's lease and site plan, with the right to order refurbishment, and the operating hours of the store; (2) commanded the use of a specific IBM, Inc. platform for accepting and processing employment applications; (3) forbade the hiring of employees who had tattoos or "unprofessional" body modifications that could not be covered while detailing the colors and style of clothes employees could wear and when they could and could not wear them; (4) specified a list of acceptable computer and server models and processing speeds; (5) obligated

---

[10] Even if the trial court did err in allowing the jury to resolve a question of law in reaching its verdict, the error was plainly harmless, as the trial court in its opinion expressed its wholehearted agreement with the jury's conclusion. *See* Trial Court Opinion, 4/18/22, at 11 (concluding that "there was overwhelming evidence" that Robizza was not "free to operate under the agreement in any way other than in a master/servant relationship"). *See also Schneider v. Girard Tr. Bank*, 218 A.2d 259, 260 (Pa. 1966) ("If this be error, it is harmless error since the lower court, in its opinion for the court *en banc*, indicated that had it chosen to resolve the ambiguity presented by the agreements its decision would have been the same as that of the jury.").

the franchisee to maintain records of weekly or monthly sales, bank deposits, cancelled checks, and statements, receipts for food purchased, and counts of types of pizzas sold; (6) outlawed the promotion of free delivery; (7) required the use of an approved type of safe in the store and the deposit therein of anything more than $150 that could be kept in the cash registers; (8) preluded the use of delivery vehicles with "excessive" wear and tear or debris; (9) mandated that the store feature at least three telephones and digital clocks viewable from various areas of the store; (10) banned the presence of gaming machines or any form of literature not related to work; and (11) required employees to deal with complaining customers by "apologiz[ing], giv[ing] them what they want, [and] giv[ing] them something extra." **See** Domino's Pizza Operating Standards, 7/16. Critically, violation of these operating standards, observed upon unannounced inspections that Domino's had the right to conduct at any time, subjected Robizza to termination of its franchise. **See** Franchise Agreement, 8/15/06, at ¶ 18.2.2.

It is plain that this is not a franchisor-franchisee relationship like the one at issue in **Myszkowski**, where the franchisee paid Best Western a flat fee to use the trademark, contributed to advertising, and was otherwise free to operate the hotel as they saw fit so long as it did not fall below minimum quality standards. **See Myszkowski**, 634 A.2d at 626-27. Nor did Robizza have the type of day-to-day control as the franchisee in **Green v. Independent Oil Co.** who was obligated to purchase all fuel and oil from the

franchisor, but was permitted to sell other wares of his choosing, keep all profits, and handle all matters of employing store workers. *See Green v. Indep. Oil Co.*, 201 A.2d at 210.

As detailed above, Domino's used its operating standards to continuously subjugate Robizza to Domino's will as to the minutia of the store's staffing and daily operation far beyond the minimum quality threshold addressed by the product standards. The Franchise Agreement specified that, rather than merely pay a yearly fee or buy supplies from the franchisor, Robizza was obligated to pay Domino's a set percentage of Robizza's weekly receipts. *See* Franchise Agreement, 8/15/06, at ¶ 6.1. Further, Domino's retained the right to require Robizza to give it access to Robizza's bank account to allow Domino's to transfer to itself royalty fees and advertising contributions. *Id*. at ¶ 6.4.

Consequently, the instant relationship is far more akin to that at issue in *Juarbe*, in which this Court held the trial court erred in granting judgment as a matter of law to the franchisor. We required the case to be submitted to the jury to determine vicarious liability based upon the following:

> [I]t cannot be said that a clear co-equal independent contractor relationship exists where there is evidence that one party can: randomly inspect the other's operation; compel him to keep it neat and orderly; control his hours of operation; control the type and appearance of clothing worn by him and his employees; require him to adjust customer grievances; set the prices he must charge; specify the quantity and quality of products he must dispense but yet have sole discretion on delivery and allocation of such products; prohibit him from posting unauthorized signs; and compel him not to sell products of a competitor. When such

powers are maintained under the threat of a termination of the operator's lease and business at the end of a brief term, Exxon's exercise of substantial control is evident.

*Juarbe*, 431 A.2d at 1078.

In sum, the judgment entered upon the jury's verdict in this case is sound. Domino's control over Robizza, which exceeded mere protection of its brand and trademark, was sufficiently robust and extensive to deem Robizza its servant or agent for purposes of vicarious liability for the negligence of Robizza's employee.[11] Therefore, we affirm the trial court's denial of Domino's motion for JNOV and the judgment entered upon the jury's verdict.

Judgment affirmed.

P.J. Lazarus and Judges Olson, Kunselman, Nichols, Murray, Beck, and Lane join this Opinion.

Judge King files a Dissenting Opinion.

_____

[11] Domino's contends that this holding is in conflict with decisions in other jurisdictions. *See* Domino's brief at 40-42 (collecting cases). In so doing, Domino's does not address whether those jurisdictions utilize the same legal principal-agent framework to determine vicarious liability. Our research revealed that other jurisdictions ruled in accord with us that Domino's established a principal-agent relationship through its pervasive control over the franchisee. *See Domino's Pizza, LLC v. Wiederhold*, 248 So.3d 212, 222 (Fla. Dist. Ct. App. 2018) (affirming jury's finding that Domino's exerted sufficient control to be vicariously liable for the delivery driver's accident and declining Domino's "invitation for this Court to reweigh the evidence or recharacterize its control as being limited to brand maintenance activities"). *See also Viado v. Domino's Pizza, LLC*, 217 P.3d 199, 207 (Or. App. 2009) (holding a reasonable jury could conclude that "Domino's exercised sufficient control over [its franchisee] to establish an agency relationship," although ultimately ruling that vicarious liability did not follow based upon the specific-instrumentalities paradigm that is not the law in Pennsylvania).

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>1/31/2025</u>