J-E03001-24

2025 PA Super 28

| | | |
|---|---|---|
| CLARENCE DAVID CORYELL, AND SANDRA CORYELL, H/W | : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : : : : | |
| STEVEN MORRIS, JASON DAWSON, ROBIZZA, INC., AND DOMINO'S PIZZA LLC | : : : : : : : | No. 1977 EDA 2021 |
| APPEAL OF: DOMINO'S PIZZA LLC | : | |

Appeal from the Judgment Entered September 21, 2021
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  180602732

BEFORE:  LAZARUS, P.J., BOWES, J., OLSON, J., KUNSELMAN, J., NICHOLS, J., MURRAY, J., KING, J., BECK, J., and LANE, J.

DISSENTING OPINION BY KING, J.:          **FILED JANUARY 31, 2025**

I depart from the Majority's analysis on several grounds.  First, I think we can review the denial of the summary judgment motion in this case given the confusion in our caselaw surrounding this issue at the time the court ruled on Domino's motion.  Second, I believe the trial court erred in failing to decide the issue of vicarious liability as a matter of law where the parties agreed at the summary judgment stage that the Standard Franchise Agreement was unambiguous and governed the relationship between Domino's and Robizza.  Third, I think the trial court also erred by failing to decide the issue of vicarious liability as a matter of law in ruling on Domino's post-trial motion for JNOV.  Finally, I conclude that the Standard Franchise Agreement in this case demonstrates that Domino's lacked sufficient day-to-day control over the

operations of Robizza such that it could be held vicariously liable for the negligence of Robizza's delivery driver. For these reasons, I respectfully dissent.[1]

Initially, I concur with the Majority that under our **current** caselaw, the denial of a pre-trial motion for summary judgment is not reviewable on appeal when the same claims raised in the summary judgment motion are resolved at trial; and that the proper question on appeal becomes whether the court erred in denying JNOV. (**See** Majority Op. at 6-7). Given the confusion in this area of law when the trial court denied summary judgment, however, Domino's could have reasonably expected that it would be able to challenge the denial of its summary judgment motion on appeal following trial. As the Majority acknowledges, there have been several Pennsylvania cases where this Court has addressed the merits of challenges to the denial of a motion for summary judgment following trial. **See, e.g., Windows v. Erie Ins. Exch.**, 161 A.3d 953 (Pa.Super. 2017);[2] **Krepps v. Snyder**, 112 A.3d 1246

---

[1] I agree with the Majority that Domino's second issue on appeal challenging the denial of compulsory nonsuit is moot because Domino's presented evidence after its motion was denied. **See Tong-Summerford v. Abington Mem. Hosp.**, 190 A.3d 631, 640 (Pa.Super. 2019) (stating: "[W]here a defendant presents evidence following the denial of a motion for nonsuit, the correctness of the trial court's denial is rendered a moot issue and unappealable").

[2] In **Windows**, the claims raised in the summary judgment motion concerning whether Erie's insurance policy excluded the homeowners' losses were not resolved at trial because the trial court denied Erie's motion *in limine* seeking to present evidence of its coverage defense at trial.

(Pa.Super. 2015), *appeal denied*, 633 Pa. 757, 125 A.3d 778 (2015);[3] **Hempt Bros. v. Allan A. Myers, L.P.**, 266 A.3d 661, 2021 WL 5013745 (Pa.Super. Oct. 28, 2021) (unpublished memorandum),[4] *appeal denied*, ___ Pa. ___, 279 A.3d 1184 (2022);[5] **Brownlee v. Home Depot U.S.A., Inc.**, 241 A.3d 455, 2020 WL 6197405 (Pa.Super. Oct. 22, 2020) (unpublished memorandum).[6]

Indeed, it was not until recently, in **Turnpaugh Chiropractic Health & Wellness Ctr., P.C. v. Erie Ins. Exch.**, 297 A.3d 404 (Pa.Super. 2023), that this Court attempted to clarify the law in this area.  In **Turnpaugh**, Erie

_____

[3] Unlike **Windows**, the **Krepps** Court reviewed the denial of a pre-trial motion for summary judgment following trial, even where the same claims raised in the summary judgment motion were resolved at trial.

[4] **See** Pa.R.A.P. 126(b) (stating we may cite to and rely on unpublished decisions of this Court filed after May 1, 2019 for their persuasive value).

[5] Like **Krepps**, **Hempt Bros, Inc.** also involved a scenario where the claims raised in the summary judgment motion were subsequently resolved at trial. The **Hempt Bros, Inc.** Court noted: "This Court has not expressly discussed the issue of mootness and the procedures necessary to preserve an appeal to the denial of summary judgment after litigation at trial."  **Id.** at *5 n.11. Relying on **Windows, supra**, however, this Court stated that it would review the merits of the claims challenging the denial of the motion for summary judgment.  **See id.**

[6] In permitting review of the denial of a summary judgment motion following trial, this Court stated that "our research has uncovered no case law to support [the] contention" that "the denial of a motion for summary judgment is moot after trial."  **Id.** at *3.  Relying on **Krepps, supra**, this Court proceeded to address the propriety of the denial of Home Depot's summary judgment motion.  This Court further noted "that a litigant should be permitted to challenge, on appeal, a trial court's denial of a pretrial motion for summary judgment even after the parties have proceed[ed] to trial and a verdict.  If not, a trial court's unchecked denial of pretrial relief may result in delayed justice or a waste of judicial resources."  **Id.** at *3 n.5.

purported to appeal the denial of its motion for partial summary judgment, in which it had argued that the provider's claim that Erie improperly repriced certain invoices was legally insufficient because the provider had failed to present an expert witness or an expert report to support this claim. *Id.* at 411. This Court explained:

> Upon the denial of a motion for summary judgment which is based on the sufficiency of the evidence supporting the plaintiff's claims, a party has multiple avenues to seek relief. The party may (1) seek permission to file an interlocutory appeal pursuant to 42 Pa.C.S.A. § 702(b), or (2) challenge the legal sufficiency of the plaintiff's cause of action during trial by filing a motion for compulsory nonsuit at the close of plaintiff's case-in-chief pursuant to Pa.R.C.P. 230.1 or a motion for a directed verdict at the conclusion of the trial pursuant to Pa.R.C.P. 226. To preserve a post-trial claim to the legal sufficiency of the plaintiff's case for appeal, the defendant must recast this claim in a motion for [JNOV] pursuant to Pa.R.C.P. 227.1(a)(2).
>
> As such, a motion for summary judgment generally does not preserve an issue for appellate review once a case proceeds to trial and a final judgment is entered. Thereafter, the party must file a motion for JNOV and the disposition of that motion will provide the basis for appellate review. …

*Id.* at 411-12 (some internal citations and footnote omitted). Relying on the then-recent decisions in *Yoder v. McCarthy Constr. Inc.*, 291 A.3d 1 (Pa.Super. 2023), *appeal granted on unrelated grounds*, ___ Pa. ___, 318 A.3d 757 (2024) and *Xtreme Caged Combat v. Zarro*, 247 A.3d 42 (Pa.Super. 2021), *appeal denied*, 669 Pa. 68, 260 A.3d 924 (2021), the *Turnpaugh* Court concluded that Erie lost the opportunity to seek immediate relief on the claims raised in the summary judgment motion where Erie did

not seek permission to file an interlocutory appeal under Section 702. ***Turnpaugh, supra*** at 412-13. "However, after trial commenced and a verdict was entered in favor of [the p]rovider, the issue became whether the trial court erred in denying Erie's motion for JNOV, which raised the same legal argument as Erie raised in its motion for summary judgment." ***Id.*** at 413. Thus, this Court proceeded to review Erie's claim in the context of the trial court's denial of its motion for JNOV.[7]

Given the inconsistency in our caselaw, it would be unfair to the instant parties to decline to consider the appeal from the denial of summary judgment in this case given that the trial court denied Domino's motion for summary judgment on May 26, 2020, well before this Court issued its decision in ***Turnpaugh***.[8] Thus, Domino's could not have intuited that it needed to seek permission to file an interlocutory appeal under Section 702(b) to preserve its challenge to the court's denial of the motion for summary judgment, as the

---

[7] The ***Turnpaugh*** Court noted that this Court has "on occasion reviewed the merits of challenges to the denial of summary judgment after a trial has been held." ***Id.*** at 412 n.5 (citing ***Windows, supra***, ***Krepps, supra***, and ***Brownlee, supra***).

[8] I also note that the ***Turnpaugh*** Court discusses its holding in the context of motions for summary judgment attacking the **sufficiency of the evidence** to sustain the plaintiff's claims. The motion for summary judgment before us does not involve a question of the sufficiency of the evidence but is one of contract interpretation to determine whether vicarious liability may attach. Still, I agree with the ***Turnpaugh*** Court's holding that where the same claim raised in a motion for summary judgment is presented and resolved at trial, the proper scope of review should be from the denial of a later motion for JNOV.

Majority suggests. (**See** Majority Op. at 8 n.8). To me, Domino's should not be held to a recently-emerging standard on when this Court should review the denial of a motion for summary judgment when, at the time of the relevant proceedings here, cases such as **Windows** and, more analogously **Krepps**, allowed it to defer a challenge to the denial of summary judgment until after the case proceeded to trial.

If we were to review this appeal as one from the denial of the motion for summary judgment:

> [O]ur scope of review is plenary, and our standard of review is the same as that applied by the trial court. … An appellate court may reverse the entry of a summary judgment only where it finds that the [trial] court erred in concluding that the matter presented no genuine issue as to any material fact and that it is clear that the moving party was entitled to a judgment as a matter of law. In making this assessment, we view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. As our inquiry involves questions of law, our review is *de novo*.
>
> Thus, our responsibility as an appellate court is to determine whether the record either establishes that the material facts are undisputed or contains insufficient evidence of facts to make out a *prima facie* cause of action, such that there is no issue to be decided by the fact-finder. If there is evidence that would allow a fact-finder to render a verdict in favor of the non-moving party, then summary judgment should be denied.

**Windows, supra** at 956 (internal citations omitted).

Here, both Domino's and the Coryells moved for summary judgment on the issue of vicarious liability. While arguing over the construction of the

Standard Franchise Agreement and what kind of relationship it created, they concurred that the agreement was unambiguous and controlling. Both also asserted that the trial court, and not a jury, should determine vicarious liability because the matter was one of contract interpretation. This is in line with our caselaw. *See Consolidated Rail Corporation v. ACE Property & Casualty Ins. Co.*, 182 A.3d 1011, 1027 (Pa.Super. 2018), *appeal denied*, 648 Pa. 165, 191 A.3d 1288 (2018) (stating that where facts giving rise to relationship are not in dispute, question of relationship between parties is one which is properly determined by court). *See also Green v. Independent Oil Co.*, 414 Pa. 477, 484, 201 A.2d 207, 211 (1964) (stating: "The sole evidence of the relationship between Independent and Graffius is the Dealer Agreement. Since the terms of such agreement are not in dispute and since the interpretation and construction of that agreement determines the relationship between the parties, it was the function of the court, not the jury, to determine the relationship between Independent and Graffius").

The terms of the Standard Franchise Agreement which govern the relationship between Domino's and Robizza are unambiguous and not in dispute. It is well-settled that interpretation of an unambiguous contract is a legal question:

> In cases of a written contract, the intent of the parties is the writing itself. If left undefined, the words of a contract are to be given their ordinary meaning. When the terms of a contract are clear and unambiguous, the intent of the parties is to be ascertained from the document itself. When, however, an ambiguity exists, parol evidence is admissible

to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is patent, created by the language of the instrument, or latent, created by extrinsic or collateral circumstances. A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. While unambiguous contracts are interpreted by the court as a matter of law, ambiguous writings are interpreted by the finder of fact.

*Kripp v. Kripp*, 578 Pa. 82, 90-91, 849 A.2d 1159, 1163 (2004) (internal citations omitted). "[B]ecause contract interpretation is a question of law, our review of the trial court's decision is *de novo* and our scope of review plenary." *Mitch v. XTO Energy, Inc.*, 212 A.3d 1135, 1138 (Pa.Super. 2019). Thus, I disagree with the Majority that there is a mixed question of law and fact in this case. Significantly, none of the cases the Majority cites regarding mixed questions of law and fact involves contract interpretation. (*See* Majority Op. at 9-10). Moreover, "the issue as to whether there are no genuine issues as to any material fact presents a question of law, and therefore, on that question [the reviewing court's] standard of review is *de novo*." *Summers v. Certainteed Corp.*, 606 Pa. 294, 307, 997 A.2d 1152, 1159 (2010) (internal citation omitted).

At the summary judgment stage, both Domino's and the Coryells agreed that the Standard Franchise Agreement was unambiguous. In its motion for summary judgment, Domino's attached affidavits from Jason Dawson, owner of Robizza, and Joseph Devereaux, Domino's Director of Franchise Services. (*See* Motion for Summary Judgment, 3/2/20, Exhibit D (Devereaux Affidavit, 2/27/20; R.R. at 303a-309a) and Exhibit E (Dawson Affidavit, 2/26/20; R.R.

- 8 -

at 379a-384a)). In their affidavits, both Dawson and Devereaux rejected that the Standard Franchise Agreement created a master-servant relationship between Domino's and Robizza; instead, they stated that the two parties were independent contractors. Domino's argued that the underlying facts were not in dispute because, "[t]he record is driven by the testimony of the two parties to the franchise relationship (via Mr. Dawson and Mr. Devereaux) and the terms of the Franchise Agreement." (Memorandum of Law in Support of Summary Judgment, 3/2/20, at 8; R.R. at 186a). Because the terms of the underlying agreement were not in dispute, and the agreement controlled the franchise relationship, Domino's argued that the trial court and not a jury should determine vicarious liability. (*Id.*) (citations omitted).

The Coryells responded that "[t]he relationship between Robizza and Domino's is controlled by their August 15, 2006, Standard Franchise Agreement[.]" (Response in Opposition to Domino's Summary Judgment Motion, 5/11/20, ¶ 14; R.R. at 392a). They disavowed, however, Domino's attempts to rely on affidavits for its construction of the agreement. As they explained, because the Standard Franchise Agreement was unambiguous and controlled the argument, "any affidavit created only for the purpose of this litigation that attempts to interpret that contract or otherwise characterize Robizza and Domino's relationship should be afforded no weight." (*Id.*) While still asserting that the Standard Franchise Agreement created a master-servant relationship as a matter of law, the Coryells nonetheless conceded that "classifying the relationship formed by the Franchise Agreement is a

matter of contract interpretation for [the trial court]." (Memorandum of Law in Response to Domino's Motion for Summary Judgment, 5/11/20, at 5; R.R. at 421a). Moreover, in responding to the motion, the Coryells offered no evidence outside the agreement about the actual practice of Domino's and Robizza under their Standard Franchise Agreement. Instead, they attached the deposition of January Shook, a Domino's corporate employee who used to be the area leader for Robizza. (*See* Response in Opposition to Domino's Summary Judgment Motion, 5/11/20, Exhibit D (January Shook Deposition, 1/24/20; R.R. at 579a-602a)). They also included an expert report from Roy Jones, a former Domino's executive. (*Id.* at Exhibit T (Roy Jones Expert Report, 4/16/20; R.R. at 927a-941a)). According to the Coryells, both Shook's deposition and Jones' report showed that Domino's understood that its Standard Franchise Agreement with its franchisees gave it the right to create mandatory rules affecting the daily operations of its stores. (*Id.* at ¶¶ 75-81, ¶¶ 84-87; R.R. at 411a-413a). In so arguing, however, the Coryells still admitted that issues of contract interpretation are for the trial court to resolve. (*Id.* at ¶ 87; R.R. at 413a).

At this stage of the proceedings, neither Domino's nor the Coryells claimed that there was any factual dispute about the nature of the relationship between Domino's and Robizza or that the contract was unambiguous. The parties simply disagreed over how the Standard Franchise Agreement should be construed. *See Pappas v. UNUM Life Ins. Co. of Am.*, 856 A.2d 183, 187 (Pa.Super. 2004) (stating: "Mere disagreement between the parties on

- 10 -

the meaning of language or the proper construction of contract terms does not constitute ambiguity. Such disagreement will not impede disposition of the parties' claims on summary judgment"). As a result, while ambiguous contracts are interpreted by the finder of fact, unambiguous contracts are interpreted by the trial court as a matter of law. *See Kripp, supra* at 1163. Consistent with these principles where the sole evidence of the relationship between the parties is found in an agreement and where the terms of the agreement are not in dispute, I would conclude that it is the function of the trial court to determine the relationship between the parties. *See Green, supra* at 485, 201 A.2d at 211 (holding trial court erred in submitting to jury question of relationship of parties where sole evidence was their agreement). Thus, I would hold that the trial court erred in not deciding the issue of vicarious liability at the summary judgment stage as a matter of law.

Even if we are precluded from reviewing the denial of Domino's summary judgment motion and we review the issue on appeal through the lens of whether the denial of JNOV was proper, my conclusion would remain the same.[9] Significantly, neither party disputed the terms of the Standard Franchise Agreement at trial. The Majority states that "a review of Domino's motion for JNOV and the Coryells' response readily reveals the conflicting facts presented at trial." (Majority Op. at 15). I disagree with this assertion.

---

[9] The Majority accurately states the scope and standard of review relevant to reviewing the denial of JNOV. (*See* Majority Op. at 8-9). Thus, I need not restate it.

Rather, the testimony of the witnesses at trial merely recounted what the agreement stated and **what those witnesses believed those provisions meant**. Importantly, none of the witnesses testified that the actual practice of the parties varied in any way from the terms of the Standard Franchise Agreement. To be sure, Jones, Devereaux, and Shook all testified that they believed Domino's had the right under the Standard Franchise Agreement to set standards for Robizza to follow. Jones testified to the franchisee's obligations under the Standard Franchise Agreement. His testimony does not vary from the terms of those documents, and he stated that those terms were enforced. Devereaux and Shook testified that Domino's exercised its contractual rights by adopting not only product standards to ensure the quality of food associated with the Domino's brand, but also Operating Standards that mandated how Robizza operated its store. Those standards could be changed by Domino's at any time, and Domino's issued Operating Standards in July 2016 that governed the day-to-day operations of the store. That is precisely what the Standard Franchise Agreement provides.

Thus, the witnesses at trial presented a narrative of the terms of the Standard Franchise Agreement and Operating Standards and what control those provisions gave Domino's over Robizza. In other words, this is not a situation where the Standard Franchise Agreement provided one thing, but the witnesses testified that the actual practice differed from what the agreement dictated. Just like at the summary judgment stage, the Coryells did not dispute that the Standard Franchise Agreement or Operating

Standards were unambiguous; the Coryells relied on their unambiguous nature to contend that those documents were sufficient alone to impose vicarious liability. As such, I disagree with the Majority's contention that "there was conflicting evidence of the nature of Robizza's relationship with Domino's such that it was for the jury to evaluate" the issue of vicarious liability. (Majority Op. at 18). In my view, the trial court erred by permitting the jury to determine whether Domino's was vicariously liable.

As to whether Domino's could be held vicariously liable under the Standard Franchise Agreement, I conclude that it could not. As the Majority correctly notes, in the context of a franchisor-franchisee relationship, the relevant inquiry is "whether the alleged master has day-to-day control over the manner of the alleged servant's performance." *Myszkowski v. Penn Stroud Hotel, Inc.*, 634 A.2d 622, 626 (Pa.Super. 1993). (*See also* Majority Op. at 11).

Nevertheless, I cannot agree with the Majority that the terms of the Standard Franchise Agreement created a master-servant relationship in this case. Daily control of the franchisee's operations remains necessary for the imposition of vicarious liability. Even though a franchise agreement may have many requirements and standards for operating the store, that is not the type or degree of "control" necessary to support vicarious liability under the caselaw in Pennsylvania. *See, e.g., Myszkowski, supra* at 627 (explaining that "standards in order to maintain a uniform quality of inn service only addresses the **result** of the work and not the **manner** in which it is

conducted") (emphasis in original); ***Smith v. Exxon Corp.***, 647 A.2d 577, 582-83 (Pa.Super. 1994), *appeal denied*, 543 Pa. 716, 672 A.2d 309 (1996) (stating that standards for product quality, store appearance, appearance of personnel and how to respond to customer complaints to preserve Exxon's trademarks did "not amount to Exxon having control over the manner in which the work [was] accomplished").

Here, the relationship between Domino's and Robizza is governed by the Standard Franchise Agreement dated August 15, 2006, and the concomitant Operating Standards issued under that agreement in July 2016. As to day-to-day control, the Standard Franchise Agreement makes clear that Robizza recruited, hired, trained, scheduled, supervised and paid all the store's employees. (***See*** Standard Franchise Agreement, 8/15/16, at ¶ 15.6; R.R. at 482a). On this point, the agreement states that the persons who worked in the store were Robizza's employees, and that those persons were not agents or employees of Domino's. (***Id.***) Relatedly, the Standard Franchise Agreement disclaimed that Domino's had any legal right to direct Robizza's employees in the operation of the store. (***Id.*** at ¶ 11.1; R.R. at 475a). Even when Domino's gave advice or suggestion, the agreement disclaimed that it assumed any responsibility or duties allocated to Robizza under the Standard Franchise Agreement. (***Id.***)

The Operating Standards reinforced this point, providing that Robizza was responsible for "all employment practices and policies." (***See*** Operating Standards, Issued July 2016, at 12; R.R. at 567a). This included hiring

decisions, with the standards requiring criminal background checks, but otherwise giving Robizza discretion in making employment decisions. (*See id.* at 11-12; R.R. at 566a-567a). Based on these provisions, I can only conclude that the Standard Franchise Agreement ceded day-to-day control over all employment matters to Robizza as the franchisee, thus suggesting an independent contractor-contractee relationship.

The same holds true for Robizza's control over its delivery drivers, from who could be hired to how they drove their vehicles. As for the former, the Operating Standards gave minimum age and experience standards, along with restrictions on hiring certain persons to be drivers with a history of traffic violations, at-fault accidents or serious driving-related violations. (*Id.* at 20-21; R.R. at 575a-576a). After drivers were hired, both the Standard Franchise Agreement and Operating Standards provided only that drivers strictly comply with all laws, regulations and rules of the road and due care and caution when driving their vehicles. (*Id.* at 17; R.R. at 572a). Beyond this, the Operating Standards added little to that already required by the Vehicle Code about how delivery drivers were to operate their vehicles. The Operating Standards merely required that vehicles be periodically inspected; vehicles not show excessive damage or wear; drivers wear seatbelts and not use their cell phones while driving; and drivers not having other persons in their vehicles during deliveries unless that passenger was approved personnel. (*Id.* at 21-22; R.R. at 576a-577a). While these standards touched on delivery services,

none of them gave Domino's daily control over how those services were accomplished.

Under the Standard Franchise Agreement, Robizza retained internal day-to-day control over its employees and delivery drivers. Other than setting basic minimum standards for the driver's qualifications, vehicle and safe operation, Domino's had no daily control over the delivery driver that caused the accident leading to this action. Indeed, Domino's had no connection or right to control the driver, as it was Robizza who hired, trained, supervised, and paid him. The Standard Franchise Agreement shows that Robizza had day-to-day control over the store's employees and delivery drivers. ***See Myszkowski, supra*** at 626-27 (holding Penn Stroud managed day-to-day operations of the business, in part, because it hired, fired, paid and supervised hotel's employees). ***See also Green, supra*** at 483, 201 A.2d at 210 (holding that oil company and service station were independent contractors, in part, because station hired and fired its own employees).

The same is true regarding the other aspects of the Standard Franchise Agreement, under which Robizza had the responsibility of implementing these standards on a day-to-day basis. Notably, Robizza was responsible for (1) constructing the store or leasing its premises; (2) obtaining all required permits for the store (building, driveway, utility, health, sanitation, and sign); (3) buying or leasing equipment, fixtures, furniture and signs; (4) buying ingredients, beverages, cooking materials, containers, packaging materials, paper and plastic products, utensils, uniforms, menus, forms, and cleaning

supplies; (5) having its own bank account and keeping its own books and records; (6) direct, on-premises supervision of the store; and (7) obtaining and carrying insurance for the store. (**See** Standard Franchise Agreement, 8/15/16, at ¶¶ 8.1, 8.2, 12.2, 14.1, 15.6, 15.7; R.R. at 472a-473a, 476a, 478a, 482a-483a). Moreover, Domino's had no ownership interest in Robizza, nor did it compensate Robizza as its employee. Concerning the latter, Domino's received a royalty fee from Robizza based on its sales. (**See id.** at ¶¶ 6.1, 13.1; R.R. at 469a, R.476a). Taken together, I would hold that these factors show that Robizza retained day-to-day control over the operations of the store.[10]

---

[10] I find the facts of this case distinguishable from those present in **Juarbe v. City of Philadelphia**, 431 A.2d 1073 (Pa.Super. 1981), on which the Majority relies. In **Juarbe**, the record contained evidence of an affidavit of Thomas Anderson, who had served as the Executive Director of an association of service station operators in the states of Pennsylvania and Delaware. Mr. Anderson "expressed his strong feeling that Exxon employed its superior and substantial economic position in the relationship to exert substantial control over the manner in which dealers, such as Mr. Davis, operate their businesses." **Id.** at 1078. Additionally, this Court noted as "[m]ost significant, … evidence that Exxon maintained tight control over the operations of its dealers by threatening not to renew their leases and sales agreements if they failed to tow the line in all respects." **Id.** This Court further noted that there was evidence that Exxon "frequently threatened not to renew the leases and sales agreements of its operators if they failed to adhere **not only to the requirements of [the relevant agreements]**, but also to Exxon's 'suggested' business conduct." **Id.** at 1079 (emphasis added). Under the facts before it, this Court concluded that the record contained "sufficient evidence of control by Exxon to justify the submission of that issue to the jury." **Id.** at 1080. Thus, **Juarbe** involved facts that evidenced Exxon's control **beyond** what was provided for in the relevant agreements. Here, Domino's level of control over Robizza was in accord with that provided in the Standard Franchise Agreement.

The fact that Domino's reserved the right to inspect the store at any time and terminate the franchise under certain conditions does not change my position. As to inspection, I note that Domino's power was not unfettered, as it needed to provide written notice and an opportunity to cure any alleged defective conditions. (*Id.* at ¶¶ 17, 18.2.1-18.2.2; R.R. at 485a-487a). In any event, as this Court recognized in *Myszkowski*, the ability to terminate the alleged servant does not necessarily indicate that there was a continuous subjection to the will of the alleged master so as to create a master-servant relationship, especially when the franchisee could seek legal redress for any such termination. *See Myszkowski, supra* at 627. *See also Green, supra* at 485, 201 A.2d at 211 (explaining that right to terminate relationship with cause is not dispositive of relationship status between parties).

Additionally, the Standard Franchise Agreement disclaimed any master-servant relationship between Domino's and Robizza, stating explicitly that the franchisor and franchisee were "independent contractors." (*See* Standard Franchise Agreement, 8/15/16, at ¶ 22.8; R.R. at 499a-500a). Indeed, the agreement stated that Domino's would not be liable for "any damages to any person or property arising directly or indirectly out of the operation of the Store, including but not limited to those damages which may occur while your employees are making or returning from making deliveries[.]" (*Id.*; R.R. at

499a).  While not dispositive,[11] inclusion of this provision is clearly consistent with what the other provisions show, namely, that Robizza had control over the day-to-day operations of the store.  **See Myszkowski, supra** at 627 (noting that agreement between Best Western and Penn Stroud specifically provided that their relationship was that of independent contractors).

This outcome is in accord with decisions in other states that Domino's is not vicariously liable for the alleged negligence of an employee of one of its franchisees.  **See, e.g., Lind v. Domino's Pizza LLC**, 37 N.E.3d 1 (Mass. Ct. App. 2015), *review denied*, 473 Mass. 1103, 40 N.E.3d 553 (2015) (affirming grant of summary judgment to Domino's because it did not control or have right to control policy and practice that allegedly cause harm to plaintiff); **Patterson v. Domino's Pizza LLC**, 60 Cal.4th 474, 333 P.3d 723 (2014) (Supreme Court held summary judgment should have been granted to Domino's because it did not control workplace activities of employees of franchisee); **Rainey v. Langen**, 998 A.2d 342 (Me. 2010) (affirming grant of summary judgment to Domino's on vicarious liability claims because Domino's quality control requirements and minimum operational standards did not

_____

[11] As the Majority points out, this language is not dispositive.  **See George v. Nemeth**, 426 Pa. 551, 554, 233 A.2d 231, 233 (1967) (stating: "Although the Distribution Agreement signed by Nemeth and Freihofer specifically refers to their relationship as being one of an independent contractor, this is not determinative of the matter for it is the actual practice between the parties which is crucial").

reserve control of franchisee's day-to-day operations).[12]

My review of the Standard Franchise Agreement, the terms of which were unambiguous and not disputed, compels me to conclude that Domino's did not control or have the right to day-to-day control over how Robizza operated its store.  I simply cannot agree with the Majority's position that the "Franchise Agreement and 2016 operating standards left Robizza with practically no discretion how to conduct the day-to-day operations of its franchise store."  (Majority Op. at 19).  Because Domino's did not have such control under the Standard Franchise Agreement, it could not be held vicariously liable for the negligence of Robizza's employees.  The relationship between the two parties was that of independent contractor-contractee rather than master-servant.[13]  Thus, I would reverse and remand to the trial court for entry of an order that Domino's did not exercise or have the right to exercise sufficient control over its franchisee Robizza such that it could be held vicariously liable for the negligence of Robizza's delivery driver.

---

[12] I acknowledge that the Majority has also uncovered two cases from other jurisdictions where courts have concluded that Domino's exerted sufficient control over its franchisee.  (**See** Majority Op. at 22).

[13] Based on my analysis, I disagree with the Majority's conclusion that any error in permitting the jury to decide the question of law concerning vicarious liability was harmless where the trial court stated in its opinion that it agreed with the jury's verdict.  As explained above, I believe both the jury, and the court in evaluating the jury's verdict, were wrong.